735 F.2d 121
 116 L.R.R.M. (BNA) 2480, 101 Lab.Cas. P 11,032,
6 Employee Benefits Ca 1808
 DISTRICT 17, DISTRICT 29, LOCAL UNION 7113, AND LOCAL UNION
6023, UNITED MINE WORKERS OF AMERICA, and John
Ramey and Joseph McCardle on behalf of
themselves and others
similarly situated, Appellees,
v.
ALLIED CORPORATION, Appellant,
and
Armco, Inc., Shannon Pocahontas Coal Co., corporations, and
the United Mine Workers of America 1974 Benefit
Plan and Trust, Defendants.
DISTRICT 17, DISTRICT 29, LOCAL UNION 7113, AND LOCAL UNION
6023, UNITED MINE WORKERS OF AMERICA, John Ramey
and Joseph McCardle on behalf of
themselves and others
similarly situated, Appellees,
v.
ARMCO, INC., Appellant,
and
Allied Corporation, Shannon Pocahontas Coal Co.,
corporations and the United Mine Workers of
America 1974 Benefit Plan and Trust, Defendants.
DISTRICT 17, DISTRICT 29, LOCAL UNION 7113 AND LOCAL UNION
6023, UNITED MINE WORKERS OF AMERICA, John Ramey
and Joseph McCardle, on behalf of
themselves and others
similarly situated, Appellees,
v.
SHANNON POCAHONTAS COAL CO., Appellant,
and
Allied Corporation, Armco, Inc., corporations and the United
Mine Workers of America 1974 Benefit Plan and
Trust, Defendants.
DISTRICT 17, DISTRICT 29, LOCAL UNION 7113 AND LOCAL UNION
6023, UNITED MINE WORKERS OF AMERICA, John Ramey
and Joseph McCardle on behalf of
themselves and others
similarly situated, Appellants,
v.
ALLIED CORPORATION, Armco, Inc., Shannon Pocahontas Coal
Co., corporations and the United Mine Workers of
America 1974 Benefit Plan and Trust, Appellees.
 Nos. 83-1117(L) and 83-1210 to 83-1212.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 5, 1983.
Decided May 8, 1984.
 
 Willis J. Goldsmith, Washington, D.C. (Deborah Crandall, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., Charles L. Woody, Spilman, Thomas, Battle & Klostermeyer, Charleston, W.Va., Paul M. Thompson, Gregory B. Robertson, Hunton & Williams, Richmond, Va., on brief), for appellants.
 Webster J. Arceneaux, III, Charleston, W.Va. (Grant Crandall, Crandall, Pyles & Crandall, Charleston, W.Va., Michael H. Holland, Deborah Stern, Daniel B. Edelman, Yablonski, Both & Edelman, Washington, D.C., on brief) and William F. Hanrahan, Gen. Counsel, UMWA Health and Retirement Funds, Washington, D.C. (Mary Anne Gibbons, Associate Counsel, Washington, D.C., on brief), for appellees.
 Before SPROUSE and CHAPMAN, Circuit Judges and MERHIGE, District Judge.*
 CHAPMAN, Circuit Judge.
 
 
 1
 Allied Corporation (formerly Allied Chemical Corporation), Armco, Inc. and Shannon Pocahontas Coal Company, Inc.[1] appeal the decision of the district court that Allied is obligated to provide health and non-pension benefits[2] to a class of some 190 of Allied's retired former employees unless and until Allied can negotiate with Armco and Shannon Pocahontas for the latter two companies to provide the benefits. In their amended complaint, plaintiffs[3] invoke the district court's jurisdiction under, inter alia, Sec. 301 of the Labor Management Relations Act of 1947, 29 U.S.C. Sec. 185 and Sec. 502 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Sec. 1132. The district court found that Allied, in transferring its coal mining assets to Armco and to Shannon Pocahontas, had breached Article I of the National Bituminous Coal Wage Agreement of 1978[4] (1978 Wage Agreement) by not obligating the transferee companies to assume responsibility for the health benefits of class members.[5] The court also found that Armco and Shannon Pocahontas had breached Article I by assuming Allied's coal operations without assuming Allied's obligations to its retired employees.
 
 
 2
 Allied provided health care coverage for plaintiffs throughout the term of the 1978 Wage Agreement, the last collective bargaining agreement to which it was a signatory. The clear language of the Wage Agreement required health benefit payments only during the term of the contract and not thereafter.[6] The district court was clearly in error in extending Allied's obligation to pay for these benefits beyond the expiration date (March 26, 1981) of the 1978 contract. Allied is not a signatory to the 1981 National Bituminous Coal Wage Agreement.
 
 
 3
 We also find that plaintiffs did not prove the elements necessary to hold that Allied should be estopped from discontinuing the payments. Plaintiffs did not prove that Allied violated ERISA. We further find that the United Mine Workers of America 1974 Benefit Plan and Trust is responsible for the health benefits to the plaintiff class. Therefore, we reverse the decision of the district court.
 
 
 4
 * The BCOA and the UMWA negotiate collective bargaining agreements every three years. Allied was a signatory to the 1978 Wage Agreement which was in effect from March 27, 1978 through March 26, 1981. The subsequent collective bargaining contract, the 1981 Wage Agreement, became effective on June 7, 1981. Armco and Shannon Pocahontas, but not Allied, were signatories to the 1981 contract.
 
 
 5
 The defendant 1974 Benefit Plan and Trust is an irrevocable trust created and perpetuated under the 1974, 1978 and 1981 National Bituminous Coal Wage Agreements. The trust resulted from labor negotiations between the UMWA and Bituminous Coal Operators Association. Under the Wage Agreements of 1974 and 1978 the coal mining companies made contributions to the 1974 trust of a certain dollar amount for each ton of coal mined and for each hour's pay to a union employee. The original purpose of the trust during the term of the 1974 Wage Agreement was to provide health and other non-pension benefits for 1974 Pensioners and for union miners.
 
 
 6
 During the term of the 1978 Wage Agreement the 1974 Benefit Trust was to continue for the purpose of providing health benefits for 1974 Pensioners who were not eligible for such benefits from any employer. The 1981 Wage Agreement continued the arrangement for the 1974 Benefit Trust to protect 1974 pensioners not eligible for such benefits from any other employer. Under the 1981 Wage Agreement no contributions were required by the coal mining companies because at that time the corpus of the trust exceeded $37 million and the annual interest income greatly exceeded all claims and costs of administration.
 
 
 7
 Armco and Shannon Pocahontas did not agree to assume Allied's obligations for health benefits for class members when the Harewood mine was sold to Armco and the Shannon Branch mine was sold to Shannon Pocahontas. These sales took place while the 1978 Wage Agreement was in effect. After the transfers of the two mines, Allied continued to provide health benefit coverage for its formerly retired employees until September 1982. In July 1982 Allied advised the trustees of the 1974 Trust that, because the Wage Agreement of 1978 was no longer in effect, the corporation would terminate payment of Blue Cross-Blue Shield premiums as of September 1, 1982 for its retired former employees who had worked at the Harewood and Shannon Branch mines. Allied later advised its retirees that the 1974 Benefit Plan would be responsible for providing them with such health care benefits.
 
 
 8
 The argument that the 1974 Trust should provide health care coverage when other sources are not available is based on Article XX(c)(3)(iii) of the 1978 Wage Agreement which provides:
 
 
 9
 The 1974 Benefit Plan and Trust shall continue after May 31, 1978, for the sole purpose of providing health and other nonpension benefits, during the term of this Agreement, to any retired miner under the 1974 Pension Plan or any successor plan(s) thereto who would otherwise cease to receive the health and other non-pension benefits provided herein because the signatory Employer (including successors and assigns) from which he retired is no longer in business.
 
 
 10
 The Trustees of the 1974 Trust concluded that the trust was not responsible for the retirees' health care coverage because Armco and Shannon Pocahontas were Allied's "successors" and were not "no longer in business."
 
 
 11
 During the term of the 1978 Wage Agreement, various statements were made by employees of Allied that, plaintiffs contend, support the district court's finding that Allied should be estopped from discontinuing the payments.
 
 
 12
 In a letter of March 3, 1980, Ronald J. Russell, who was at that time Allied's manager for labor relations and equal employment opportunity, wrote to one of Allied's former employees at the Harewood mine: "This letter is being sent to you to advise you that your Health Benefits (Blue Cross/Blue Shield) are still the responsibility of Allied Chemical and not of Armco." Russell also stated in this letter that "Your coverage remains intact during the terms of the Contract."
 
 
 13
 In February 1980 Russell wrote to the UMW Fund stating:
 
 
 14
 All employees and beneficiaries of employees who are Allied Chemical's responsibility regarding Health Benefits and Life Insurance coverage will be administered at the Corporation's Morristown New Jersey Headquarters. A listing of these employees is attached.
 
 
 15
 Another letter dated April 29, 1982, from Allied's pension services administration department addressed to Blue Cross/Blue Shield included the statement: "As per the Labor Agreement in 1978, Allied Corporation (Semet-Solvay Division) being the last company signatory to a UMWA contract that employed Mr. Stewart, [one of the class members] is at present responsible for providing insurance coverage."
 
 II
 
 16
 The district court found that Allied breached Article I of the 1978 Wage Agreement by not "securing the agreement of its successor[s] to assume Allied's health benefit obligations to its retired employees under the agreement" and directed as the remedy for this breach that Allied provide the benefits beginning some two years after the expiration of the collective bargaining agreement and extending indefinitely into the future unless Allied secures Armco's and Shannon Pocahontas' agreement to provide for these benefits.[7]
 
 
 17
 It is undisputed that Allied paid for all health benefits due under the 1978 Wage Agreement until long after it expired on March 26, 1981. Allied is no longer in the coal mining business and is not a signatory to the 1981 Wage Agreement.
 
 
 18
 The clear unambiguous language of Article XX--HEALTH AND RETIREMENT BENEFITS--1978 Wage Agreement reflect that these benefits and Allied's responsibility are for the term of the agreement only.
 
 Article XX, Section (c)(3)(i) provides:
 
 19
 (3)(i) Except as provided in (ii) below, effective on June 1, 1978, each signatory Employer shall establish an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other nonpension benefits for its Employees covered by this Agreement as well as pensioners, under the 1974 Pension Plan and Trust, whose last classified employment was with such Employer. The benefits provided pursuant to such plans shall be guaranteed during the term of this Agreement by each Employer at levels set forth in such plans.
 
 
 20
 The contributions by employers to the 1974 Benefit Plan are also limited to the term of the 1978 Wage Agreement. Article XX, Section (d)(i)(iv) and (d)(l)(v)(c) provide:
 
 
 21
 (iv) Into the 1974 Benefit Trust: for the period beginning on March 27, 1978, and ending on April 26, 1978, 16.5 per hour on each such hour worked; for the period beginning on April 27, 1978, and ending when this Agreement is terminated, 2.0 per hour on each such hour worked. Any signatory Employer who does not elect to implement coverage through a private insurance carrier(s) on the effective date of the Agreement shall contribute for the period beginning March 27, 1978, and ending May 31, 1978, an additional 86.0 per hour on each such hour worked.
 
 
 22
 (c) Into the 1974 Pension Trust: for the period beginning March 27, 1978, and ending March 26, 1979, 58.5cents per ton on each such ton; for the period beginning March 27, 1979, and ending March 26, 1980, 59.0cents per ton on each such ton; and for the period beginning March 27, 1980, and ending when this Agreement is terminated, 58.0cents per ton on each such ton; ...
 
 
 23
 The Wage Agreements are negotiated every three years and every benefit and every obligation is open for renegotiation.
 
 
 24
 The primary negotiators of Article XX for the BCOA and the UMW, respectively, testified in depositions that the health benefit provisions of each collective bargaining agreement are negotiated on a contract-by-contract basis. The negotiator for the UMW was asked, "And you would be free to change, not only the benefits levels, as you earlier testified, but you would also be free to change the definition of 'going out of business' from contract to contract, or anything else for that matter, isn't that right?"
 
 
 25
 His reply was, "Everything is open for renegotiation at the end of the contract."
 
 
 26
 The chief negotiator for the BCOA answered similar questions:
 
 
 27
 Q. [By counsel] As far as you are concerned, are the parties free to change [health] benefit levels from contract to contract?
 
 
 28
 A. [By the BCOA negotiator] Are they free?
 
 
 29
 Q. Meaning the BCOA and the UMWA.
 
 
 30
 A. Yes, we negotiate on the basis of the term of the contract, and then a whole new ball game at the next negotiations.
 
 
 31
 * * *
 
 
 32
 * * *Q. Would it be possible for the parties, meaning the BCOA and UMWA, to one day agree to provide no benefits for retirees ...
 
 
 33
 A. For the UMWA and the BCOA?
 
 
 34
 Q. Yes.
 
 
 35
 A. I would think that is possible, yes.
 
 
 36
 There is no factual or legal basis for the district court's conclusion that obligations under the 1978 Wage Agreement extended past its expiration date. Employer obligations and employee rights, under a collective bargaining agreement, do not survive the expiration of the agreement absent a clear intention of the parties. Local 1251 UAW v. Robertshaw Controls Co., 405 F.2d 29 (2nd Cir.1968). The testimony of the contract negotiators clearly show that all rights and benefits were open for negotiation every three years.
 
 
 37
 Assuming that Allied breached the 1978 Agreement, have the plaintiffs proved any damages? We find plaintiffs have not shown that they have suffered a "legally cognizable loss as a result of the alleged breach." Baltimore Regional Joint Board v. Webster Clothes, Inc., 596 F.2d 95, 98 (4th Cir.1979). Webster and Westinghouse Electric Corp. v. I.B.E.W., 561 F.2d 521 (4th Cir.1977) cert. denied, 434 U.S. 1036, 98 S.Ct. 771, 54 L.Ed.2d 783 (1978), both hold that an arbitrator's award is not sustainable where the damages awarded exceeded any monetary loss caused by breach of the collective bargaining agreement. Although the instant case does not involve the review of an arbitrator's award, it involves the breach of a labor contract. The same issue was presented in Webster and Westinghouse and the reasoning of Webster and Westinghouse is persuasive. "It is clear that in order to be entitled to compensatory damages for contract breach, a party must have suffered some legally cognizable loss, be it manifestly monetary or measurable in monetary terms." Webster, 596 F.2d at 98.
 
 
 38
 The district court's authority to fashion a remedy is broad. Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). We accept this premise as well as plaintiff's contention that a collective bargaining agreement is not an ordinary contract. Bowen v. United States Postal Service, --- U.S. ----, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983). Notwithstanding certain distinctions between a contract and a collective bargaining agreement, however, courts traditionally apply a contract analysis in determining the appropriate measure of damages for breach of a collective bargaining agreement.[8] See, e.g., Webster, supra; Westinghouse, supra; International Brotherhood of Electrical Workers Local 12 v. A-1 Electric Service, Inc., 535 F.2d 1 (10th Cir.), cert. denied, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976); Local 127, United Shoe Workers v. Brooks Shoe Mfg. Co., 298 F.2d 277 (3rd Cir.1962).
 
 
 39
 In order for the remedy granted by the district court to be upheld, there must be evidence of reasonably foreseeable damages that were caused by the alleged breach and resulted in actual loss to the class members.
 
 
 40
 Plaintiffs contend that "[h]ad Allied required its purchasers to assume its obligations, its 1974 pensioners [class members] would have continuing coverage under the plans of its purchasers Armco and Shannon Pocahontas." This contention must be examined by applying the Hadley v. Baxendale, 9 Exc. 339 (1854) rule of foreseeability: that a defendant in a breach of contract action is liable for all damages resulting from the breach that could have been fairly and reasonably contemplated by the parties to the contract at the time of its execution. Brooks Shoe, supra, 298 F.2d at 281-282. Because Article XX and Article I limit any rights and liabilities of the parties to the term of the contract, the parties could have reasonably foreseen that any damages would extend for the term of the contract, until March 27, 1981.[9]
 
 
 41
 Plaintiffs' view of foreseeability requires us to find that, had Allied passed on its obligations under the 1978 Wage Agreement to Armco and to Shannon Pocahontas, the latter two companies would have then provided benefits to persons who had never worked for them under a new collective bargaining agreement and under all subsequent agreements. This conclusion requires too great a leap of logic and too all-encompassing a view of foreseeability for us to adopt. To achieve such a result Allied would have had to obligate its successors to engage in negotiations in 1981 and indeed to guarantee payment of the benefits under future contracts. This interpretation of foreseeability ignores contingencies that could have occurred such as strikes or negotiated terms providing for a party other than the employer to assume responsibility for the payments. It also ignores the plain language of Article I of the 1978 Wage Agreement which refers only to "Employer's Obligations Under This Agreement." No mention is made of any subsequent agreement.
 
 
 42
 Nor has the key element of causation been shown. District 17 has not shown that, because Armco and Shannon Pocahontas were not obligated to assume health benefit obligations under the 1978 Agreement, the transferee companies did not undertake responsibility for the benefits under the 1981 Wage Agreement. If Armco and Shannon Pocahontas had assumed Allied's Article XX obligations, they, instead of Allied, would have been bound to provide health and other non-pension benefits for plaintiffs until March 27, 1981. Like Allied, they would have had no further obligations to those persons, unless and until there is a new contract so providing.
 
 
 43
 The 190 retirees have not shown that they suffered any actual loss as a result of Allied's not having transferred certain obligations to Shannon Pocahontas or to Armco. "A proper remedy in breach of contract suits is to place the plaintiffs in the position they would have attained had the contract been performed." A-1 Electric Service, supra at 3, citing Interstate United Corp. v. White, 388 F.2d 5, 7 (10th Cir.1967). The contract was "performed" by Allied in that class members received their health benefits throughout the term of the 1978 contract. The question of obligations of companies other than Allied under subsequent contracts should have been determined when a new collective bargaining agreement was being negotiated. Under the terms of the 1978 Wage Agreement, plaintiffs had a promise from Allied to make the benefit payments for the term of the agreement. Allied fulfilled this commitment. Nowhere in the 1978 Wage Agreement did Allied promise to accept responsibility for the benefit payments beyond the term of the contract. Nor did Allied agree in the 1978 Wage Agreement to obligate companies who might acquire Allied's mines to assume responsibility for benefit payments under a collective bargaining agreement other than the 1978 Wage Agreement.
 
 
 44
 There is no finding by the district court or contention made that these health benefits are "vested." Pension rights are actuarially determined and are normally vested, but health and welfare benefits are negotiated periodically and last only the life of the collective bargaining agreement. Turner v. Local Union No. 302, 604 F.2d 1219 (9th Cir.1979).
 
 III
 
 45
 The district court held that "Allied is, at the very least, estopped from denying its responsibility for payment of the benefits by continuing to pay the same for some sixteen months beyond the expiration of the 1978 Wage Agreement under circumstances that clearly indicated Allied's intention to retain and continue the obligations imposed by the terms of ERISA and Article I of said 1978 Wage Agreement."
 
 
 46
 The leading West Virginia case of Norfolk & Western Railway Co. v. Perdue, 40 W.Va. 442, 21 S.E. 755 (1895), explains the elements necessary for invocation of the estoppel doctrine:
 
 
 47
 The essential elements constituting the estoppel are ... "(1) There must be conduct, acts, language or silence amounting to a representation or a concealment of material facts. (2) These facts must be known to the party estopped at the time of his said conduct, or at least the circumstances must be such that knowledge of them is necessarily imputed to him. (3) The truth concerning these facts must be unknown to the other party claiming the benefit of the estoppel at the time when such conduct was done, and at the time when it was acted upon by him. (4) The conduct must be done with the expectation that it will be acted upon by the other party, or under such circumstances that it is both natural and probable that it will be so acted upon ... (5) The conduct must be relied upon by the other party, and, thus relying, he must be led to act upon it. (6) He must in fact act upon it in such a manner as to change his position for the worse. In other words, he must so act that he would suffer a loss if he were compelled to surrender or forego or alter what he has done by reason of the first party being permitted to repudiate his conduct, and to assert rights inconsistent with it.
 
 
 48
 District 17 argues that the three statements made by employees of Allied and Allied's conduct in continuing to make payments for some sixteen months after the expiration of the 1978 Wage Agreement constitute a basis for estoppel. One of these statements, that "health benefits ... are still the responsibility of Allied Chemical and not of Armco" was made in a March 1980 letter sent to Harewood mine retirees. This statement is not a misrepresentation. The letter states that Armco would not assume Allied's responsibility to provide health benefits for the retirees. No representation is made with respect to the duration of Allied's responsibility to make the payments. Nor does the statement of February 1980 include any expression of Allied's intent to continue benefit payments in the future. The April 1982 letter to Blue Cross/Blue Shield cannot form the basis for a finding of estoppel because it was not sent to any of the class members and there is no evidence that any of the retirees relied on the letter.
 
 
 49
 Finally, District 17 argues that because of Allied's conduct in continuing to make the payments, plaintiffs were lulled into false security and therefore did not bring suit to enjoin the transfers of the mines. At the time of the transfers, however, class members were told that Allied and not the transferees would provide the benefits. District 17 is charged with knowledge of Article I and of the duration of the 1978 Wage Agreement. If plaintiffs relied on Allied's conduct or statements such reliance was not reasonable in light of plaintiffs' knowledge of the provisions of the 1978 Wage Agreement. Nor was such reliance detrimental since class members received the coverage for the term of the contract as well as for a period of time after the contract had expired.
 
 IV
 
 50
 In finding an ERISA violation, the district court concluded that, by attempting to terminate the retirees' benefits in 1982, Allied "violated the requisite 'care, skill, prudence and diligence' imposed upon it by ... 29 U.S.C. Sec. 1104(a)" and failed "to discharge its duty 'in accordance with the documents and instruments 1978 Wage Agreement governing the plan' " as required by 29 U.S.C. Sec. 1104(a)(1)(D). The pertinent provisions of 29 U.S.C. Sec. 1104 are:
 
 
 51
 (a)(1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
 
 
 52
 * * *
 
 
 53
 (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter or subchapter III of this chapter.
 
 
 54
 29 U.S.C. Sec. 1104.
 
 
 55
 It is unnecessary for us to decide the issues of whether Allied was a "fiduciary" or "administrator" under the statutory scheme. ERISA provides for specific remedies in the event of a breach by a fiduciary. 29 U.S.C. Sec. 1109(a). The fiduciary may be held "personally liable to make good to such plan any losses to the plan resulting from each such breach," and may be required "to restore to such plan any profits ... made through use of assets of the plan." (Emphasis added). The act also provides that the fiduciary "shall be subject to such other equitable or remedial relief as the court may deem appropriate."
 
 
 56
 The first two "remedies" are clearly inapplicable to the facts of this case. There were no losses to an employee benefit plan and no fiduciary profited through use of assets of the plan. With respect to other "appropriate remedies", this court's holding is that the remedy granted by the district court was not an appropriate one because Allied had fulfilled its commitment to provide health care coverage for the term of the 1978 Wage Agreement.
 
 V
 
 57
 The district court found Armco and Shannon-Pocahontas had breached Article I of the 1978 Wage Agreement by purchasing mines from Allied and not assuming Allied's obligations to the plaintiffs. The language of Article I is not susceptible to such construction. The clear language applies only to employers who sell, convey and transfer mines covered by the agreement. Buyers or purchasers of mines are no where mentioned. At the time of the transfer neither Shannon-Pocahontas nor its predecessors in name were signatories to the 1978 agreement. After acquiring the mine Shannon-Pocahontas did execute the agreement.
 
 
 58
 Armco was a signatory at the time of the transfer of the Allied mine, but it does not follow that Armco is prevented from buying from Allied if it suspected Allied might be in violation of Article I when such violation caused no loss or damage to anyone. The district court cites no statute, case or contract language to support this holding, which is clearly erroneous.
 
 VII
 
 59
 The trustees of the 1974 Benefit Plan and Trust are trying to avoid the very purpose justifying their existence. The record clearly shows that this trust was created to provide for retired miners who became "orphans" by not being covered under some other plan. During negotiations preceding the 1978 Wage Agreement, BCOA tried to eliminate the 1974 Benefit Plan and Trust, but UMWA insisted that the 1978 Wage Agreement continue contributions to the 1974 plan to provide benefits to pensioners, who would otherwise lose benefits when benefits were changed from a multi-employer plan, covering all active and retired miners, to an individual company plan. As a result of collective bargaining the 1978 Wage Agreement provided for a continuation of payments by the employers into the 1974 plan for the purpose of providing for retired miners not covered by some other plan. This trust is the safety net intended to catch the plaintiffs, and it may not be removed by the trustees, now that it is needed.
 
 The 1978 Wage Agreement provided:
 
 60
 The 1974 Benefit Plan and Trust shall continue after May 31, 1978, for the sole purpose of providing health and other non-pension benefits, during the term of this Agreement, to any retired miner under the 1974 Pension Plan and Trust who would otherwise cease to receive the health and other non-pension benefits provided herein because the signatory Employer (including successors and assigns) from which he retired is no longer in business.
 
 
 61
 Article 11(f) of the 1974 Benefit Plan and Trust Agreement, as amended effective March 27, 1978, provided:
 
 
 62
 Health and death benefits ... shall ... be provided [by the 1974 Benefit Trust] to any Pensioner who receives pension benefits under the 1974 Pension Plan, ... and who would otherwise cease to receive benefits because the signatory Employer (including successors and assigns) with whom such Pensioner last worked as a classified Employee is no longer in business, provided that (i) such Pensioner is not receiving a pension based in whole or in part on years of service credited under the terms of Article 11(G) of the 1974 Pension Plan, ... or (ii) such Pensioner is not receiving a deferred vested pension based on less than 20 years of credited service. Notwithstanding the above, any Pensioner who was eligible for benefits under the 1974 Benefit Plan as a Pensioner on December 5, 1977, and who is not eligible for benefits under an individual employer benefit plan pursuant to Article XX, Section (c)(3) of the National Bituminous Coal Wage Agreement of 1978, shall be eligible for such benefits, subject to all other provisions of this plan. Health benefits shall not be provided for any month in which the Pensioner earns more than $200.
 
 
 63
 Findings of fact 14 and 15 of the district court explain the "Question and Answer" system used by the Trustees to interpret and administer the 1974 trust, as follows:
 
 
 64
 14. Pursuant to their authorization to administer the 1974 Trust, the Trustees adopted a "Question and Answer" (hereafter Q & A) system as a basis for establishing uniform rules of interpretation of the terms of the 1974 Trust to be used in deciding future questions of the 1974 Trust's responsibility. Pursuant to this system, the Trust's staff drafts questions and proposed answers for consideration by the Trustees. After its adoption by the Trustees, a Q & A is considered by the BCOA and the UMWA to be a final and binding interpretation of the terms of Article XX of the appropriate National Bituminous Coal Wage Agreement and of the pertinent provisions of the 1974 Trust.
 
 
 65
 15. In July, 1978, the Trustees adopted definitions of the term "successor" and the phrase "no longer in business" to govern future questions about whether the 1974 Trust was responsible to provide benefits under Article II F of the 1974 Trust, as amended effective March 27, 1978. Those definitions, as set forth in Q & A H-16, are as follows:
 
 
 66
 Subject: DEATH BENEFITS:HEALTH BENEFITS: "Successor" and "No Longer in Business"
 
 
 67
 Reference: 1974 Benefit Plan, as amended, Articles II F, G, and I: III B (1978)
 
 Part I
 
 68
 Question: What is a "successor" company, signatory to the 1978 Wage Agreement, for purposes of health and death benefit obligations of the 1974 Benefit Plan and Trust?
 
 
 69
 Answer: 1. A company, itself signatory to the 1978 Wage Agreement, will be considered a "successor" if it expressly assumes health and death benefit obligations of retired persons last employed by the predecessor company by, for example, payment of health care bills or death benefits or execution of a contract with a health carrier providing coverage for such persons; or, if the signatory company implicitly assumes these obligations by, for example, oral promises of coverage or by other acts of similar implication.
 
 
 70
 2. Where no explicit or implicit assumption of obligations has occurred, a company signatory to the 1978 Wage Agreement will be considered a "successor" if:
 
 
 71
 (a) the new company has signed the 1978 Wage Agreement; and
 
 
 72
 (b) a majority of the employees presently working for the new employer formerly worked for the old employer; and
 
 
 73
 (c) the location is the same geographical area and the work functions have been continued relatively unchanged; and
 
 
 74
 (d) operations are not suspended for longer than six months (not counting a strike period); and
 
 
 75
 (e) either 1. there has been a transfer of a substantial proportion of the assets of the old company employer (seller) to the new company (purchaser),
 
 
 76
 or 2. the new company is owned and operated by substantially the same people who owned and operated the seller company
 
 Part II
 
 77
 Question: When is a company "no longer in business" for purposes of health and death benefit obligations of the 1974 Benefit Trust?
 
 
 78
 Answer: A company is "no longer in business" when
 
 
 79
 1. the company claims that it is no longer in business by notifying the Funds in writing that the company is no longer in business and will not resume operations and thus requests that the Funds, in reliance upon the company's statement, make payments to any appropriate beneficiaries eligible under provisions of the amended 1974 Benefit Plan and Trust; and
 
 
 80
 2. the company has not received income from the production or sale of coal, or transportation of coal, or related activities, for at least six months even if it retains a license to engage in coal mining or processing within the applicable state or states and retains an office.
 
 
 81
 A company may still be in business even if it satisfied # 2 if circumstances clearly indicate that the company remains in business. For example, a company is still in business even if it has not mined coal for six months if the company is publicly seeking new employees or if the company indicates to its laid-off employees that it will re-employ them at an early future date.
 
 
 82
 The district court found that Allied had received no income from the production or sale of coal, or related activities, since it disposed of its mines in 1980 to Armco and Shannon Pocahontas. It is undisputed that Armco and Shannon Pocahontas in purchasing these mines assumed no obligation or liability with respect to any present or former Allied employee under any employee benefit plan.
 
 
 83
 The trustees found that Allied was "no longer in business" and that Allied's obligations to provide health benefits to its 1974 Pensioners ended on March 27, 1981, but the Trustees concluded that the 1974 Benefit Trust had no responsibility to Allied's 1974 Pensioners because Allied had "successors" which were not "no longer in business."
 
 
 84
 Since neither Armco nor Shannon Pocahontas assumed any obligation to Allied's 1974 Pensioners, they or either of them could be Allied's "successors" under Question & Answer H-16 only if it
 
 
 85
 (a) signed the 1978 Wage Agreement,
 
 
 86
 (b) hired a majority of the employees of Allied,
 
 
 87
 (c) commenced operations in a location in the same geographical area and continued work functions relatively unchanged,
 
 
 88
 (d) did not suspend operations for more than six months, and either (1) acquired "a substantial portion of the assets" of Allied or (2) is owned and operated by the same people who owned and operated Allied.
 
 
 89
 The Trustees did not address the question of the proportion of Allied's assets acquired by Armco and Shannon Pocahontas, but it is admitted that Allied is a very large industrial complex still involved in many businesses and no longer involved in any phase of coal mining. There is no evidence that either of the purchasers hired a majority of Allied's employees or that the purchasers are owned and operated by the same people who owned and operated Allied.
 
 
 90
 Since Armco and Shannon Pocahontas do not qualify as "successors" under the Q & A H-16, and since Allied is "no longer in business" because it has so notified the Trustees, has received no income from the production or sale of coal or transportation of coal for at least six months and is not publically seeking new employees, nor has it indicated to laid off employees that they will be re-employed at an early date, the decision of the Trustees denying benefits to Allied's 1974 Pensioners is arbitrary and capricious. The district court's affirmation of this decision therefore cannot stand.
 
 
 91
 Decisions of the 1974 trustees are subject to review by appellate courts and must be supported by substantial evidence and are subject to examination under the arbitrary and capricious rule. Maggard v. O'Connell, 671 F.2d 568 (D.C.Cir.1982). At page 571 the Maggard court states:
 
 
 92
 In the case before us today, we think it would be quite dangerous "to slip into judicial inertia" given the "combination of danger signals" rebutting "the presumption of agency regularity." There have been a number of cases already holding the Funds' regulations and findings to be arbitrary and capricious. [footnote omitted] It should also be noted that what is being reviewed here is not the findings of an agency but rather the decision of private trustees based on evidence collected by a hearing officer employed by a private trust. A reviewing court should keep in mind that those close to the trust indeed have a duty to preserve the corpus of that trust and, accordingly, are naturally disinclined to make awards from it. It is also to be surmised that these individuals have no tenure, less job security, and are generally less well-insulated from outside pressures than those government employees whose decisions are more commonly reviewed under the "arbitrary and capricious" or "substantial evidence" standards.
 
 
 93
 None of this is intended to disparage the performance of the trustees and their hearing officers. As we just stated, they might be remiss in their duties were they to be too generous with the funds entrusted to them. However, judicial review of their denial must be undertaken with similarly stern hand and flinty eye. Preservation of the corpus of the trust is the duty of the trustees, but not at the expense of the intended beneficiaries.
 
 
 94
 Maggard involved the trustees of the UMWA 1950 Trust and the omitted footnote lists seven reported cases and two unreported cases involving arbitrary and capricious actions of the trustees. Although the trustees of the 1950 Trust are not the same as the trustees of the 1974 Benefit Plan, the language in Maggard is instructive and indicative of the efforts of private trustees of the coal miners' trusts to be overly protective of the corpus at the expense of the intended beneficiaries.
 
 
 95
 The court's conclusion that Armco and Shannon Pocahontas are "successors" to Allied cannot stand examination under Howard Johnson Company v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees Union, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). Howard Johnson bought the hotel and restaurant business of P.L. Grissom and Son. Grissom's employees were represented by a union, and its collective bargaining contract stipulated that the contract was binding on "successors". The contract between Howard Johnson and Grissom provided that Howard Johnson would not recognize or assume any labor agreements or obligations and liabilities thereunder. The union brought an action against Howard Johnson to compel arbitration under the predecessors' collective bargaining agreement, but the Supreme Court held that the mere existence of a successor clause in a bargaining agreement did not bind Howard Johnson when it was perfectly clear that Howard Johnson refused to assume any obligations under the agreement.
 
 
 96
 Armco and Shannon Pocahontas refused to assume any obligations to Allied employees under the purchase instrument signed with Allied, and they do not qualify as "successors" under the Q & A H-16 definition.
 
 
 97
 The retired miner plaintiffs are the intended beneficiaries of the 1974 Benefit Plan and Trust and are entitled to the health and non-pension benefits provided thereunder.
 
 
 98
 REVERSED.
 
 SPROUSE, Circuit Judge, dissenting:
 
 99
 I respectfully dissent.
 
 
 100
 The majority opinion is well-written and ultimately achieves a humane result, but I believe it places the financial burden for the retirees' benefits on the wrong party. Allied, not the UMWA Benefit Trust Fund (Fund), should be assessed the costs of these pensioners health and insurance benefits, for its breach of the 1978 Wage Agreement and ERISA caused the threatened cut-off.
 
 
 101
 The Fund's principal purpose is to provide health and insurance coverage to 1974 UMWA pensioners whose last known employer is no longer in the coal-mining business. An employer no longer engages in coal-mining for the purposes of assigning liability to the Fund when it and its successors cease the sale, production or transportation of coal. Benefit Trust Agreement, Question and Answer, H-16. The Fund, in denying benefits to the nearly 200 pensioners involved in this appeal, found that Allied, though no longer in business itself, sold its operations to firms meeting the successor criteria. It ruled that, since these successors were still mining at the locations purchased from Allied, the Fund's regulations prevented it from picking up the cost of the pensioners' benefits.
 
 
 102
 The majority reverses this decision because it believes the Fund acted arbitrarily in denying benefits. See, e.g., Maggard v. O'Connell, 671 F.2d at 571. I cannot agree. A successor exists for the purpose of deciding the Fund's liability if the purchaser (1) signs the 1978 NBCWA, (2) draws a majority of its employees from the seller, in this case Allied, (3) operates at the same geographical location performing essentially the same job functions, (4) has not suspended its operations for more than six months, and (5) either acquires a substantial portion of the seller's assets or is owned and operated by the same people controlling the seller. The majority concedes that criteria (1), (3), and (4) have been met, but curiously finds no evidence that the successors drew a majority of their employees from Allied (2) or acquired a substantial portion of its assets (5).
 
 
 103
 The record and a fair reading of the Fund's regulations, however, dispute the majority's interpretation of the available evidence. The Fund, in reaching its decision on the retirees' benefit applications, stated that Armco employed 159 former Allied workers in its 215 person work force, while Shannon employed 298 former Allied workers in its 401 person work force. None of the parties in this litigation have disputed these figures, yet the majority inexplicably ignores this information in placing liability on the Fund.
 
 
 104
 The majority further concludes that "[t]he Trustees did not address the question of the proportion of Allied's assets acquired by Armco and Shannon". This conclusion is simply wrong. The Fund's opinion explicitly states that Allied "transferred most of the assets of its mines" to Armco and Shannon Pocahontas, a finding confirmed by Allied officials in testimony before the district court. I can only surmise that the majority overlooks this evidence because it believes that Allied's total corporate assets, even those unrelated to coal mining, must be considered in determining whether it has sold a substantial part of its operations to a successor. The illogic of this position becomes evident, however, when one realizes that such a construction of the Fund's criteria would virtually preclude large, diversified companies from ever having a smaller successor--an advantage I seriously doubt the drafters of the 1978 Wage Agreement intended to confer.
 
 
 105
 The Fund meticulously followed its rules and procedures in deciding the pensioners eligibility for benefits, and its substantive conclusion concerning the successorship status of Armco and Shannon Pocahontas was unassailable. In these circumstances, the Fund's denial of benefits was anything but arbitrary and capricious. Maggard v. O'Connell, 671 F.2d at 570-571, See also UMWA v. Robinson, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982).
 
 
 106
 The majority's error in placing liability on the Fund does not mean that the retirees should be denied continued benefits or even that the responsibility should be shifted to the successor companies, Armco and Shannon. Cf. Howard Johnson Co. v. Detroit Local Joint Executive Board, Hotel and Restaurant Employees' Union, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). In my mind, the threat to the pensioners' benefits flows directly from Allied's breach of the 1978 Wage Agreement and ERISA and consequently continued responsibility rests with it.
 
 
 107
 In Article I of the 1978 Wage Agreement, Allied agreed that its [coal-mining] operations ... [would] not be sold, conveyed, or otherwise transferred ... to any successor without first securing the agreement of the successor to assume [Allied's] obligations under this [contract]." It breached this agreement by selling its Harewood and McDowell County coal operations without passing along its pensioner obligations to the successors. The majority is not disturbed by this breach because Allied provided a form of alternative performance that guaranteed the pensioners' benefits for the life of the 1978 contract. Article I of the 1978 Wage Agreement, however, guaranteed pensioners more than the right to benefits for the life of the contract; it provided an assurance that their interests would be fully protected if the health plans were later renewed in the 1981 National Bituminous Coal Wage Agreement. The right guaranteed through this assurance was contingent, but it is obvious value to the pensioners as demonstrated by the present controversy. Had Allied abided by the terms of Article I, Armco and Shannon would have entered the 1981 negotiations as the last responsible employers of the retirees. As such, they would have been obligated to negotiate with the union concerning the continual funding of the 1974 Benefit Fund. The companies may have succeeded in bargaining away these obligations or modifying the benefit arrangements, but the pensioners' rights would have been finally decided by the same process that created them, collective bargaining. Allied's breach short-circuited this process and removed the pensioners' benefits from consideration at the bargaining table. The resulting threat to the pensioners continued benefits was a natural and foreseeable consequence of Allied's self-serving unilateral action, and thus was remediable under the Hadley v. Baxendale rationale.
 
 
 108
 Finally, I believe the majority is mistaken when it concludes that the remedy ordered by the district court was not appropriate under ERISA. Section 1109 of the Act provides that "[a]ny person ... who breaches any of the responsibilities, obligations or duties imposed upon fiduciaries ... shall be subject to such other equitable or remedial relief as the court may deem appropriate." (emphasis added). The senate committee reports discussing this provision emphasize that Congress intended to give courts broad discretion in fashioning a remedy that best carries out the purposes of the Act and is most advantageous to the participants and beneficiaries of the involved health and insurance plan. S.Rep. No. 93-127, 93d Cong., 1st Sess., reprinted in, 1974 U.S.Code Cong. & Admin.News 4639, 4838, 4871. See also Eaves v. Penn, 587 F.2d 453, 462-63 (10th Cir.1978); Freund v. Marshall & Ilsley Bank, 485 F.Supp. 629, 643 (W.D.Wis.1979). These reports further emphasize that federal courts are to draw on principles of traditional trust law "in using [their] equitable and remedial powers to rectify ERISA violations" Eaves v. Penn, 587 F.2d at 462.
 
 
 109
 One of the remedies traditionally available to beneficiaries injured by a breach of trust is to be restored "to the position they would have occupied but for the breach." Eaves, 587 LF.2d at 462. The district court, in the present case, attempted to accomplish just that by ordering Allied to continue paying the costs of the pensioners' benefit package. Its decision furthered ERISA's expressed goal of safeguarding worker benefits and was consistent with the broad remedial powers Congress granted to the courts. Accordingly, I would affirm the district court's judgment.
 
 
 
 *
 Honorable Robert R. Merhige, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 The Shannon Branch mine was transferred from Allied to Vera Mining Company, a wholly owned subsidiary of Allied Corporation. Through a merger, Vera became a wholly owned subsidiary of Royalty Smokeless Coal Company, which is a subsidiary of A.T. Massey Coal Company. Vera subsequently changed its name to Shannon Pocahontas
 
 
 [2]
 Health and other non-pension benefits (referred to collectively as health benefits) included death benefits and medical insurance through Blue Cross/Blue Shield
 
 
 [3]
 Plaintiffs (also referred to collectively as District 17 or 1974 Pensioners) are two district and two local unions and a class consisting of some 190 persons who worked for Allied at two coal mines formerly owned by Allied. These persons retired during the period when the National Bituminous Coal Wage Agreement of 1978 was in effect and received benefits paid for by Allied pursuant to guidelines in the 1974 Benefit Plan and Trust and who have been notified that their health benefits would no longer be paid for by Allied. Class members also include spouses and dependents and surviving spouses and surviving dependents of class members who worked for Allied
 
 
 [4]
 The National Bituminous Coal Wage Agreement of 1978 is a collective bargaining agreement between the United Mine Workers of America (UMWA) and the Bituminous Coal Operators' Association, Inc. (BCOA)
 Article I of the 1978 Wage Agreement provided:
 This Agreement shall be binding upon all signatories hereto, including those Employers which are members of signatory associations, and their successors and assigns. In Consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successors to assume the Employer's obligations under this Agreement. Provided that the employer shall not be a guarantor or be liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this agreement.
 
 
 [5]
 In its conclusion of law Number Four, the court found that "Article I of the 1978 Wage Agreement prohibits a signatory employer from transferring a signatory coal operation to a successor or assign without securing the agreement of the successor or assign to assume the employer's obligations under the Wage Agreement and any subsequent renewals of said Wage Agreement." (Emphasis added, not in district court's opinion)
 
 
 [6]
 See Article I, supra fn. 4. Article XX(c)(3)(i) provided:
 [E]ach signatory Employer shall establish an Employee benefit plan to provide, implemented through an insurance carrier(s), health and other non-pension benefits for its Employees covered by this Agreement as well as pensioners under the 1974 Pension Plan and Trust, whose last classified employment was with such Employer. The benefits provided pursuant to such plans shall be guaranteed during the term of this Agreement by each Employer at levels set forth in such plans. (Emphasis added.)
 
 
 [7]
 The wage agreement expired in March 1981; the district court's order was dated January 12, 1983. The 1981 Wage Agreement will expire in March 1984 and a new agreement will be negotiated
 
 
 [8]
 Plaintiffs accept the well recognized contract analysis for determining the measure of damages in arguing that "[t]raditional principles of contract damages allow recovery for reasonably foreseeable consequences of a contract breach regardless whether such damages accrue immediately or sometime--even long--in the future."
 
 
 [9]
 District 17 argues that by looking to the terms of the contract itself, defendants fail to distinguish between the duration and existence of contract rights and the rule for the measurement of contract damages, citing the union's argument in Brooks Shoe, supra, 298 F.2d at 280. In Brooks Shoe an equally divided court affirmed the district court's decision that a union could be awarded union dues for twenty years beyond the expiration date of a collective bargaining agreement where the employer breached a provision requiring the company "to continue to make the better grade shoes" at the plant represented by the union. 298 F.2d at 279. The conclusion that the district court was not clearly erroneous in finding that the company-union relationship would have continued for an additional twenty years was based on the long-standing existence and relationship of the employer and the union and employer's prospects of continuous operation. Brooks Shoe is distinguishable from the instant case because of the long-term nature of the promise to "continue to make the better grade shoes" and because the employer continued to manufacture shoes. In the instant case the parties agree that Allied is "no longer in the coal mining business."
 The question of the relationship between the duration of a contract and the measure of damages was also at issue in A-1 Electric Service, supra. The court applied the foreseeability rule to a breach of a collective bargaining agreement and concluded, as we do, that the time period for measuring any damages should end with the expiration of the contract.
 The court reasoned:
 A more reasonable cutoff date for the damages would be the end of the contractual year, in this case May 31, 1973. This is in accord with the general rule in breach of contract cases that the defendant is liable for all damages resulting from the breach that could have been reasonably and fairly contemplated by the parties at the time of execution. United Shoe Workers, Local 127 v. Brooks Shoe Mfg. Co., 3 Cir., 298 F.2d 277, 281-82; Restatement of Contracts Sec. 330. It was foreseeable in the instant case that if the collective bargaining agreement were breached, that damages would accrue for at least the remainder of the contractual period.
 535 F.2d at 4.