**Bernard P. McDONOUGH and Alma McDonough, Plaintiffs,**

**v.**

**Marion K. KELLOGG, Defendant.**

**Civ. A. No. 67-C-9-C.**

United States District Court
W. D. Virginia,
Charlottesville Division.

Jan. 13, 1969.

Herbert G. Underwood, Clarksburg, W. Va., and Charles Haugh, Jr., Charlottesville, Va., for plainitffs.

Thomas S. Currier, Charlottesville, Va., for defendant.

## OPINION and JUDGMENT

DALTON, Chief Judge.

The plaintiffs, Bernard P. McDonough and his wife, bring this diversity action under 28 U.S.C.A. § 1332, claiming that the defendant, Marion K. Kellogg, and others wrongfully interfered with and deprived them of their right to vote, by proxies, 73,137 shares of stock in Copeland Refrigeration Corporation (hereinafter referred to as Copeland). The McDonoughs allege further that because their proxies were not permitted to vote, a proposed merger of Copeland and McDonough Company, a corporation controlled by Bernard P. McDonough, was not consummated, with resulting damages to the plaintiffs of $547,300. The defendant insists that these allegations are spurious. A hearing without a jury was held in this matter on December 9, 1968 in Charlottesville, Virginia.

The facts underlying this controversy are not in dispute, and the court finds them to be as follows: In the spring of 1966 the directors of Copeland, a Michigan corporation, considered the idea of amending the by-laws of the corporation to classify and stagger the terms of the board's nine members. The amendment would provide for the election by cumulative voting of three directors each year for a term of three years. Without such an amendment, all nine directors would be elected annually for one-year terms, also by cumulative voting. The purpose of the amendment, therefore, was to assure continuity of management in the future, since two annual elections would be necessary to unseat a majority of the board's members. A collateral effect of this amendment would be that one-third rather than one-ninth of the shares of Copeland would be required, with cumulative voting, to elect a single director.

Sometime after this amendment was first discussed, the directors of Copeland learned that the plaintiff, Bernard P. McDonough, had acquired a substantial block of Copeland shares. In recognition of McDonough's interest in Copeland, the management of Copeland offered McDonough a seat on Copeland's board of directors. McDonough declined the offer, instead proposing a merger of Copeland and McDonough Company. The management of Copeland took McDonough's proposal under consideration, having the idea studied by Price, Waterhouse and Company. The report on the proposed merger by Price, Waterhouse was unfavorable, and the directors of Copeland decided that the merger would not be in the best interest of Copeland. As corporate attorney for Copeland, the defendant Kellogg was aware of these facts.

When McDonough learned of the proposal to classify and stagger the terms of the board of directors of Copeland, he advised the management of Copeland that he would oppose the amendment. Anticipating a proxy contest, Copeland retained a public relations firm specializing in proxy solicitation to assist in securing the desired amendment.

McDonough also solicited proxies from the shareholders of Copeland. The general solicitation form used by McDonough apparently complied with the

S.E.C. requirements since it referred explicitly to the classification proposal and authorized a vote against it. By means of this solicitation form McDonough obtained proxy authorizations for votes against the amendment representing 50,801 shares.

In the months preceding the January 31, 1967, stockholders' meeting, McDonough continued to acquire shares of Copeland stock. These acquisitions continued until after December 21, 1966, the record date for shares to be voted at the stockholders' meeting. Most of these shares acquired by McDonough were held in street names by various brokerage houses. A few weeks before the stockholders' meeting, McDonough realized that it would be necessary to obtain proxies from these brokers and as to shares purchased after the record date, to trace sellers through the brokers and obtains proxies from them. A different proxy solicitation form was prepared for this purpose. This "short-form" proxy authorization named the same proxy committee nominated in the form prepared for the general solicitation, but the authority of the proxies was expressed differently. The proxies were authorized to vote "for the election of Directors, and for the transaction of such other business as may properly come before said meeting." These short-form proxies were signed by the brokerage firms in whose names the shares were held for the benefit of the plaintiffs. Through this short-form proxy, McDonough obtained authorizations representing 73,137 shares of Copeland which were beneficially owned by himself, his wife, and McDonough Company.

On January 20, 1967, eleven days prior to the shareholders' meeting, McDonough instituted a suit in a federal court in Michigan seeking to enjoin the submission to the shareholders of the proposal to classify and stagger the terms of the directors. McDonough's claim for injunctive relief was based on a Michigan statute which prohibits the reduction of the number of directors of a corporation if the reduction is opposed by the number of votes sufficient to elect one director. McDonough contended that the proposed amendment to Copeland's by-laws would have the same effect as a reduction in the number of directors, since such amendment would dilute the cumulative voting power of shareholders. In November, 1967, the district court in Michigan decided that the statute did not permit the construction urged by McDonough. McDonough v. Copeland Refrigeration Corporation, 277 F.Supp. 6 (E.D.Mich.1967). The court declined to rule on the question of whether the short-form proxies were valid for the purpose of voting on the proposed amendment, since the court's interpretation of the Michigan statute meant that only a majority vote was necessary to approve the amendment. Hence, even if the short-form proxies had been counted, McDonough could not have defeated the amendment.

Also prior to the January 31, 1967, shareholders' meeting McDonough entered into a contract with Hillman Coal & Coke Company, hereinafter referred to as Hillman, pursuant to which McDonough sold and delivered to Hillman on or before January 30, 1967, 90,000 shares of Copeland stock. The contract also gave Hillman the option to purchase an additional 33,750 shares on January 31, 1967. This option was exercised by Hillman, and it appears that McDonough realized a gain of about one-million dollars through this sale.

Upon the recommendation of the firm assisting Copeland in the solicitation of proxies, Copeland had appointed Kenneth D. McLaren to serve as inspector of elections at the January 31, 1961, stockholders' meeting. Although Michigan law provides for the appointment of such inspectors at the request of any shareholder, Copeland had not previously had occasion to appoint one. As a vice-president of Corporation Trust Company, one of the leading firms providing such a service, McLaren's chief duties included serving as an inspector of elections at stockholders' meetings. Al-

though the defendant Kellogg had had some business contact with McLaren around 1931, there had been no dealings or communications between the two men during the past thirty-five years. It does not appear that Kellogg had anything to do with the selection of McLaren as inspector of the election.

The shareholders' meeting took place in Sidney, Ohio on January 31 and February 1, 1967. At the meeting McDonough's agents voted the short-form proxies representing 73,137 shares, as well as the other proxies representing 50,801 shares, in opposition to the amendment. McLaren, as inspector of the elections, ruled that the short-form proxies were invalid for the purpose of voting on the amendment to classify and stagger the terms of the directors. The amendment passed by a vote of 690,738 to 50,801, out of a total of 903,180 shares entitled to vote. The plaintiffs seek to implicate Kellogg and McLaren in a conspiracy to invalidate the short-form proxies.

The only evidence offered in support of this accusation appears in the testimony of Kellogg. Kellogg was the only witness to personally testify at the hearing, but by agreement all the depositions and entire record were admitted for consideration by the court in resolving the issues in this case.

Kellogg states that during the recess of the meeting between January 31 and February 1, McLaren approached him and asked his opinion as to the validity of the short-form proxies, which unlike the other proxies, did not specifically authorize a vote against the amendment to the by-law. After McLaren had described the short-form proxies, Kellogg gave his opinion that they did not comply with S.E.C. requirements (as provided in 17 C.F.R. §§ 240.14a–101 and 240.14a–102). McLaren did not offer his opinion until the next day after he had given his formal report on the election results. In his deposition McLaren states that the reason he gave for invalidating the short-form proxies was that although they specifically authorized a vote for the election of directors, no explicit authority was given as to the proposed amendment to the by-laws. The witnesses for McDonough insist that McLaren gave as his reason non-compliance with S.E.C. regulations. However, this conflict in the testimony is immaterial.

Likewise, it is not necessary to decide whether or not the proxies were in fact valid, although we tend to agree with the plaintiffs that they were valid. The plaintiffs point to an obscure paragraph of the S.E.C. regulations, 17 C.F.R. § 240.14a–2(c), which excepts from the S.E.C. regulations, "[a]ny solicitation [of proxies] by a person in respect of securities of which he is the beneficial owner." Where the S.E.C. requirements are not applicable, it would seem that "* * no particular formality is required in order to constitute a proxy so long as there is sufficient written evidence of authority." 18 C.J.S. Corporations § 550, at page 1251 (1939). However, we consider of more significance than the actual validity of the proxies the fact that on their face there was no indication that the proxies were solicited by the beneficial owners, the McDonoughs, and that the authorization contained in the proxies would at least initially raise some doubt, however unfounded it might turn out to be, as to whether a vote on the amendment was authorized. Conceding, without deciding, that the short-form ballots were mistakenly excluded, we do not see how this fact, under the circumstances, supports McDonough's accusation that Kellogg and McLaren are guilty of "highjacking ballots," whatever the elements of that charge might be.

The facts reveal plainly that no actionable wrong has been committed by the defendant. The plaintiffs base their complaint on the theory that the defendant is liable for the pecuniary damages sustained by the plaintiffs resulting from the defendant's intentionally depriving the plaintiffs of their right to vote their shares of stock. These damages allegedly resulted from the failure of the pro-

posed merger of Copeland and McDonough Company. We can discover only two theories of tort liability which arguably apply to the facts alleged, neither of which would permit recovery.

Both of these theories fall under the general heading, "interference with contract relationships." See 30 Am.Jur. Interference p. 72 (1958). One type of wrongful conduct is "interference with performance of contract" by any intentional act which makes the performance of the contract more difficult or impossible, or of less value to the promisee. 30 Am.Jur. Interference § 42; Annot., 26 A.L.R.2d 1227 § 3 (1952). Under this theory the plaintiffs would have to show that their contractual right to vote their shares of stock by proxies was wrongfully interfered with by the defendant, with resulting damages. The second theory has been termed "preventing making of contract." 30 Am.Jur. Interference § 36. Under this theory the plaintiffs would have to prove that the contract of merger between McDonough Company and Copeland would have been made but for the intentional and unprivileged interference by the defendant.

■ Although it is clear that the plaintiffs could not recover regardless of which state's laws are applied, the circumstances giving rise to this litigation took place in Ohio, and hence Ohio law would govern the substantive rights of the parties. See McClure v. United States Lines Co., 368 F.2d 197 (4th Cir. 1966). Ohio courts have recognized these theories of tort liability. Reichman v. Drake, 89 Ohio App. 222, 100 N.E.2d 533 (1951) (interference with performance of contract); Leibovitz v. Central National Bank, 75 Ohio App. 25, 60 N.E.2d 727 (1944) (preventing making of contract). See also Hammonds v. Aetna Casualty & Surety Company, 237 F.Supp. 96 (N.D.Ohio 1965) (inducing breach of contract). Not surprisingly, the facts of these cases bear no resemblance to the instant case. However, in these cases the Ohio courts have applied the relevant principles of law which generally obtain throughout the states, and for the purposes of this decision we may do the same.

■ The essential elements of tortious interference with the performance of a contract of (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, (3) malicious interference by the defendant, (4) a casual relationship between the defendant's interference and the breach or nonperformance of the contract, and (5) resulting damages. See 30 Am.Jur. Interference §§ 21–29, 42.

■ There is no doubt that the plaintiffs had a contractual right to vote their shares of stock by means of valid proxies—see 18 C.J.S. Corporations § 477 (1939)—and that the defendant Kellogg was aware of this right. At this point the plaintiffs' proof ends.

■ Nothing in the record would fit the requirement of malice. The word "malice" is used here in its technical, legal sense, that is, "the intentional doing of a harmful act without legal justification or excuse, or * * * the wilful violation of a known contract right." Reichman v. Drake, supra, 100 N.E.2d at 537; 30 Am.Jur. Interference § 27. Malice, in the sense of ill will or spite is not necessary, and the use of the term "malicious interference" is misleading. This requirement might be more aptly described as the intentional, unprivileged interference by the defendant. See Prosser, Law of Torts § 123, pp. 951–2, 967–9 (3rd ed. 1964).

■■ The intentional act required to impose this tort liability is not present here. It is generally recognized that negligent interference with the performance of a contract does not create tort liability. See Annot., 26 A.L.R.2d 1227, § 1, n. 5 (1952). More than a conscious act and an awareness of the plaintiff's contractual rights on the part of the defendant is required. It would seem that there must be a reasonable probability or some reason to anticipate that the defendant's acts would interfere with the plaintiff's rights. See Baruch v. Beech

Aircraft Corporation, 175 F.2d 1 (10th Cir. 1949), cert. denied, 338 U.S. 900, 70 S.Ct. 251, 94 L.Ed. 554 (1949). In the present case there is nothing to indicate that when Kellogg gave his opinion that the proxies were invalid he knew all the while that they were perfectly proper. We find no evidence of a conspiracy existing between Kellogg and McLaren, or anyone else, and nothing to suggest that Kellogg's opinion did in fact induce McLaren to exclude proxies which he knew to be valid. The record suggests the contrary.

Furthermore, under the holding of the District Court in Michigan, the management proposal to stagger the terms of the board members would not have been defeated even if the disputed proxies had been counted. Furthermore, the management proposal received more than fifty percent of the outstanding votes, a sufficient number to adopt the amendment and effectively prevent the merger even if the disputed proxies had been counted. Thus it is clear that there was no casual link between the defendant's actions and the defeat of the merger proposal nor was there any resulting damage to the plaintiffs as a result of their proxies not being counted.

There was no malicious interference by the defendant. No showing of bad faith on the part of Kellogg is present. He was privileged, as Copeland's attorney, to act as he did in giving his opinion to McLaren. The giving of one's honest legal opinion in good faith should not create a tort liability. Something more in the nature of bad faith or fraudulent actions must be shown before liability is established.

For the reasons above stated the court finds that there was no conspiracy or illegal action on the part of the defendant intended to interfere with plaintiffs' contractual rights; the court further finds that the actions of the defendant were in no way responsible for the failure of Copeland to accept the merger proposal; therefore it is adjudged and ordered that judgment be entered in favor of the defendant, and each party shall bear his own costs.

The clerk of this court is directed to send a copy of this opinion and judgment to counsel of record.