**INTERNATIONAL UNION, UMWA, Plaintiff,**

v.

**EASTOVER MINING CO., Eastover Land Co., Duke Power Co. and Virginia City Coal Co., Defendants.**

Civ. A. No. 83–0209–B.

United States District Court, W.D. Virginia, Big Stone Gap Division.

March 1, 1985.

Willard Owens, A. Randall Vehar, Washington, D.C., Stuart B. Campbell, Jr., Wytheville, Va., John B. Rayson, E.H. Rayson, Knoxville, Tenn., for plaintiff.

Homer L. Deakins, Jr., Frederick A. Stuart, Atlanta, Ga., Carl Forster, Harlan, Ky., for Eastover Mining & Land Cos.

Douglas Campbell, Tazewell, Va., Homer L. Deakins, Jr., Atlanta, Ga., Robert M. Bisanar, Charlotte, N.C., for Duke Power Co.

David D. Johnson, Charles Q. Gage, Charleston, W.V., James P. Jones, Bristol, Va., David Boyd, Chicago, Ill., for Virginia City.

## MEMORANDUM OPINION AND ORDER

GLEN M. WILLIAMS, District Judge.

International Union, United Mine Workers of America (UMWA) filed this three-count complaint pursuant to Section 301(a) of the National Labor Relations Act, 29 U.S.C. § 185(a). Count One of the complaint seeks rescission of a transaction between Eastover Mining Company, Eastover Land Company and Duke Power Company (selling defendants) and Virginia City Coal Company (purchasing defendant). Count Two seeks damages against the selling defendants for breach of the 1981 Bituminous

Coal Operators Association (BCOA) Agreement, specifically Article I thereof. Count Three seeks damages against Virginia City Coal Company for inducing the selling defendants to breach the 1981 BCOA Agreement and for interfering with UMWA's rights thereunder.

Article I of the 1981 BCOA Agreement provides in part as follows:

This agreement shall be binding upon all signatories hereto, including those employers which are members of signatory associations, and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement. Provided that the employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement.

Eastover Mining Company has filed a motion to dismiss based on two grounds: first, that the complaint fails to state an actionable claim against Eastover since Eastover met its obligations under Article I, and second, that Virginia City Coal Company did not induce a breach of the 1981 BCOA Agreement since there was no breach by the selling defendants. UMWA has filed a motion for partial summary judgment seeking judgment against all four defendants on the issue of liability only. UMWA contends that the selling defendants violated the contract as a matter of law when they sold the Jawbone operation to Virginia City without requiring Virginia City to assume the selling defendants' obligations under the 1981 BCOA Agreement. UMWA also moves for partial summary judgment against Virginia City, alleging that the record shows without dispute that Virginia City induced the

selling defendants to breach the 1981 BCOA Agreement. Virginia City has filed a motion to dismiss or, in the alternative, for summary judgment, contending that Eastover did not violate the Agreement and that Virginia City did not induce Eastover to violate the Agreement.

Eastover Mining Company and Eastover Land Company are wholly owned subsidiaries of Duke Power Company. For several years, Eastover Mining Company operated four mines: Arjay, High Splint, and Brookside, all in Harlan County, Kentucky, and Jawbone, located in Wise County, Virginia. All coal produced at these mines was sold to the parent company, Duke Power Company. Arjay and High Splint mines were operated under contract with Southern Labor Union while the Brookside mine in Kentucky and the Jawbone mine in Virginia were operated under a contract with UMWA. Because of a 1982 ruling of the North Carolina Utilities Commission concerning the passing on of costs to consumers, Duke Power decided to sell all of its Eastover mines. The Brookside mine in Kentucky was sold and the provisions of Article I of the BCOA Agreement were passed on to the purchaser. The two mines operating under contract with Southern Labor Union were sold without incident.

The Jawbone mine was operated on a tract of land leased from a subsidiary of ANR Coal Company. By January 1983, ANR decided to attempt to buy the Jawbone mine; negotiations began that same month. Neither ANR nor any of its subsidiaries had ever had any working relationship with UMWA. The evidence is clear that, from the outset of the negotiations, they did not intend to become involved with UMWA. ANR knew from the beginning of the negotiations that the 1981 BCOA Agreement contained a successorship provision (Article I). Thus, in early 1983, ANR retained a management consulting firm, Southeastern Employee Service Corporation (SESCO), to advise how the Jawbone mine could be purchased without violating the letter and spirit of Article I. SESCO wrote a letter to ANR dated Janu-

ary 25, 1983 (Parker, Exhibit 4) in which SESCO advised ANR how it could avoid Article I. First, ANR should require Eastover to contact UMWA and advise them that it was permanently shutting down the mine; second, Eastover should have a meeting with its employees and announce that the facility was permanently closing and should send a written notice of termination of the Agreement to each employee; third, a period of at least a month should pass between the date that Eastover shut down the mine and the date of approval of the buy-sell agreement between Virginia City and Eastover.

Subsequently, ANR submitted a written proposal (Robertson, Exhibit 4) offering Eastover twelve million dollars as a purchase price and requiring as preconditions that Eastover cease all operations and terminate all employees and that forty-five days elapse between the date of the termination and the closing of the sale. On March 6, 1983, ANR submitted an additional offer increasing the price to twenty million dollars, to be paid in two installments, and including the same requirements with regard to the closing of the mine. On March 10, 1983, ANR submitted another proposal offering twenty million dollars in cash. The final agreement, dated March 17, provided that the sale would be for 22.3 million dollars and included the preconditions which had been set out by ANR throughout the negotiations. Defendant Virginia City is a subsidiary of ANR which was organized for the purpose of purchasing the Jawbone mine. After an agreement in principle was made, there was an exchange of drafts of the purchase agreement. The first draft, prepared by the selling defendants, included the following paragraph, Section 1.6(a):

Covenants and agreements of *buyer.* Buyer covenants and agrees: (a) to recognize the United Mine Workers of America as the collective bargaining representative of the bargaining unit employees of the Virginia City mine located at Virginia City, Virginia and to assume EMC's obligations to those employees

under the National Bituminous Coal Wage Agreement of 1981.

The foregoing language was prepared by attorneys for Duke Power Company who were aware of the contractual successorship provision in the 1981 Agreement. It was the intention of Duke Power Company and consequently Eastover to comply with Article I of the BCOA Agreement. This specific language was used by the selling defendants in the earlier sale of the Brookside mine in Kentucky. The evidence is undisputed that at that time, the selling defendants thought that such a clause was required and that Virginia City would be a successor. Virginia City told the selling defendants that they would not accept the agreement with the foregoing language and further informed them that they would not assume the UMWA contract.

On April 8, 1983 the Jawbone mine was closed and its employees were terminated as suggested by SESCO to avoid assumption of the BCOA Agreement. The closing of the mine and termination of the employees were more than one month before the sale agreement was finally reached. Virginia City's agents stated that the mine would probably remain idle until the "end of the UMWA contract." Virginia City further expressed the view that keeping the mine idle until the 1981 Agreement expired would free it from any obligation to UMWA. The final contract between the selling defendants and Virginia City Coal Company contained the following language, designated as Section 1.7(a):

If buyer is a successor to EMC within the terms of the National Bituminous Coal Wage Agreement of 1981, (the 'Wage Agreement'), to recognize the United Mine Workers of America as the collective bargaining representative of the bargaining unit employees of Virginia City Mine located in Virginia City, Virginia, and to assume EMC's obligations to those employees under the Wage Agreement; provided, however, that Buyer reserves the right to contest the question of whether or not it is a succes-

sor within the terms of the said Wage Agreement.

In addition, Section 2.1(c) was amended so that the final draft, instead of saying that there was a transfer of all "leases, contracts," provided that there was a transfer of all "leases, contracts (other than the Wage Agreement)."

By the contract, Virginia City obtained Eastover's Jawbone operation, including all leases, contracts and equipment. This was not a stock sale but a sale of assets. Virginia City insisted that Eastover's mining permits be assigned to them. Virginia City has not operated the mine at all through the date of this opinion. The 1981 BCOA Agreement has expired; there was no operation of the mine during the life of the agreement. Most of the equipment is still in place in the mine, although some of it has been removed to other mines being operated by Virginia City.

Eastover's mining contract with UMWA first began in 1975. The 1974 BCOA Agreement was the first to adopt the language binding signatories' successors, as found in Article I of the 1981 Agreement. The 1971 contract had no similar language. This suggests that between the negotiations in 1971 and those in 1974, events occurred which caused a change in the language of the contract between UMWA and BCOA.

The cross-motions before the court present the following question: did the selling defendants breach their obligations under the UMWA contract's successorship provision (Article I) by including Sections 1.7(a) and 2.1(c) in the purchase agreement with Virginia City?

## PAROL EVIDENCE AND HISTORY OF SUCCESSORSHIP CLAUSE

In briefs filed with the court and in oral argument before the court, both the plaintiff and defendants agreed that the court's answer to the foregoing question would depend upon how the court defines the word "successor." Defendants contend that there have been numerous interpretations in arbitration decisions, in the Nation-

al Labor Relations Act and in other forums where the statutory word "successor" has been defined to have a particular meaning and not to mean any purchaser. On the other hand, the plaintiff argues: (1) that the court should consider parol evidence of the bargaining history involving the placement of the successorship clause in the 1974 contract; (2) that the court should utilize the meaning commonly understood by the parties who actually negotiated the clause, rather than a meaning taken from a court decision prior to the time that this language was placed in the Agreement, and (3) that where the parties have agreed upon the meaning of the *contractual* successorship clause, the court should honor their interpretation.

Among other documents filed in this case, is one by Joseph Yablonski who was a UMWA attorney involved in negotiating the 1974 Agreement. His affidavit sets forth the historical context in which the contractual successorship clause was negotiated into the 1974 agreement. It shows that the UMWA was concerned over an interpretation placed by the United States Supreme Court upon the *statutory* successorship doctrine. In *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) and *NLRB v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Court held that passive clauses in collective bargaining agreements which attempt to bind "successors, assigns, purchasers, lessees, or transferees" are ineffectual for that purpose and that a successor, in the absence of an express assumption, is not required by operation of law to assume the obligation of the seller's collective bargaining agreement with the union. Yablonski states that the UMWA responded to these Supreme Court decisions by securing a provision which required a signatory to the contract who was selling his property to bind his successors to the collective bargaining agreement. The Yablonski affidavit points out that the purpose of this provision was to enable the union to bind any

purchaser to comply with the UMWA contract if he bought from an employer who was signatory to the union contract.

 A collective bargaining agreement is not an ordinary contract. *Bowen v. United States Postal Service,* 459 U.S. 212, 103 S.Ct. 588, 74 L.Ed.2d 402 (1983). Moreover, collective agreements are often loosely drawn and less complete than other types of contracts. Much more must be supplied from the context in which they were negotiated to properly interpret them than is true of other contracts. Cox, *Reflections upon Labor Arbitration,* 72 Harv.L.Rev. 1482, 1500 (1959). "All collective bargaining agreements between BCOA and UMWA are not conceived in a vacuum; each side has lawyers scrutinizing every word in light of old interpretations." *Clinchfield Coal Co. v. District 28, UMWA,* 556 F.Supp. 522 at 530 (W.D.Va. 1983); *aff'd Clinchfield Coal Co. v. District 28, UMWA,* 720 F.2d 1365 (4th Cir. 1983). As this court has noted previously, "... [A]ll words in these contracts have special meaning to the parties. For example, 'employee,' 'employer,' 'classified,' 'in and around the mines,' 'signatory' and many others have grown up over the years by interpretation to have special meaning." *Id.* at 529. This is well-stated in *Communications Workers of America v. Pacific Northwest Bell Telephone Co.,* 337 F.2d 455, 459 (9th Cir.1964):

> The very nature of a collective bargaining agreement requires that it be read in the light of bargaining history and the history of the party's own interpretations. A new technical rule of evidence which would render incompetent parole evidence of a party's intent would seem peculiarly inappropriate in the area of collective bargaining.

This does not mean that use of bargaining history is always admissible as an exception to the parole evidence rule. For example, it has been held that bargaining history is not appropriate in determining whether a grievance is arbitrable. *International Union of Electrical, Radio & Machine Workers, AFL–CIO v. General Electric Co.,* 332 F.2d 485 (2nd Cir.1964). The court stated that history can be very useful in determining whether a company has violated any provision of a contract, but it is of no use in deciding whether a grievance should be submitted to an arbitrator. The same court went on to note that history would appear to be a very appropriate device for interpreting a contract if a provision is ambiguous or unclear. However, in order for something to be excluded from a contract, it must be clearly and unambiguously stated as being excluded. The court therefore stated that one should not consider parole evidence in interpreting an exclusionary clause. *Id.* at 490.

This court will consider the evidence of bargaining history simply to explain why a new Article I paragraph changed the 1974 contract language from that in the 1971 contract. The court will not accept Mr. Yablonski's interpretation of the word "successor" as evidence since none of the defendants participated in those bargaining sessions. The decision does not hinge upon the Yablonski affidavit except as it explains the reason for the change in the 1974 Agreement.

 There is no question that the word "successor" has a different meaning in different contexts depending upon whether the issue involves an unfair labor practice, the duty to recognize and bargain with a union, or the duty to arbitrate. When defined in an NLRB decision involving statutory successors, in a contractual sense, in an arbitrator's decision as distinguished from a court's, or in a pension case, the word "successor" has different meanings. *See Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. at 263, 94 S.Ct. at 2244. Other language was changed in the 1974 Agreement, not just the word "successor." The court must interpret Article I in its entirety without focusing upon a single word. The court will consider not only the language of Article I but also the facts surrounding the Eastover sale and the contract language even-

tually adopted between the selling defendants and Virginia City.

## THE MEANING OF THE ARTICLE I SUCCESSORSHIP CLAUSE AS IT RELATES TO THIS CONTRACT

■ The selling defendants contend that the Article I contractual successorship clause amounts to nothing more than a restatement of what had actually been said in 1971. This is an astounding assertion. It makes no sense to a reasonable mind that attorneys would argue for weeks over language in a contract with the result that the new language simply restates the old language. Such an argument will not hold. It is quite obvious that UMWA was not bargaining for a clause which would mean that they would wait until after a sale had been concluded and then go through a lawsuit to determine whether a person who bought from a signatory employer was a successor.

Several facts in this case stand out. One is struck by the fact that when Eastover prepared the first contract, it inserted a provision which unequivocally bound Virginia City to assume all the contractual provisions of the BCOA Agreement. Eastover and its associates interpreted their contract with UMWA the same way that UMWA now argues, that Virginia City was a successor within the meaning of the Agreement. Several other undisputed facts raise more questions than supply answers. For example, what difference does it make how long a company shuts down before a sale in determining whether the purchaser is a successor? This is a matter of form rather than substance, a meaningless ruse rather than a meaningful act. What difference does it make whether one buys the stock of a company or its assets in determining whether the purchaser is a successor? What difference does it make that a person says to those concerned, "I am not going to operate until the contract has expired" or "I am not going to operate for six months" or "I am not going to operate for five years"? The intention was to evade, rather than enter into a meaning-

ful contract. Why would a company that does not intend to operate at all or for a lengthy period of time insist on including in its purchase an assignment of the mining permits? If a purchaser is not going to mine there is no need to obtain the mining permits at all. Even if there is some question as to what the word "successor" means, there is no question what the word "assignee" means. In this case, Virginia City was an assignee of the mining permits. The BCOA Agreement (Article I) applies to assignees as well as successors. The words are interchangeable. Mining permits are expensive and not easy to get. If a person does not intend to mine or to permit someone else to mine the property in the foreseeable future, the mining permits would expire and be of no value. It is revealing that Virginia City insisted upon an assignment of the mining permits at the same time it proclaimed having no intention of mining, at least during the life of the UMWA contract.

In the light of the *Howard Johnson* and *Burns* cases, it is clear that in 1974 UMWA wanted to avoid any post-sale litigation as to whether someone was a successor. The intention in the 1974 BCOA Agreement was to assure that successorship would be required before any contract of sale was made, to assure that signatories to the Agreement would pass their obligations on to purchasers so that UMWA would not be involved in litigation with the purchaser after the contract was made. If one accepts the argument made by the defendants, the successorship clause has no meaning, it is a nullity. Both the selling defendants and Virginia City admit that they were thoroughly familiar with Article I of the 1981 BCOA Agreement. Article I provides that the Agreement should be binding upon "successors and assigns" of all employers which were signatory to the Agreement. Virginia City without question was an assignee; since assignee or successor are used in the same context, Virginia City was also a successor.

The purpose of the successorship clause which was placed in the 1974 Agreement was to overcome the rulings of the United States Supreme Court set forth in *Howard*

*Johnson* and *Burns* to the effect that a successor was not bound in the absence of an express assumption of the contract. UMWA sought the changes in the 1974 agreement to require an express assumption by a purchasing company. In light of this historical framework, it is clear that both the letter and spirit of Article I have been violated by the selling defendants because they have failed to carry out the purpose of the Agreement, which is to expressly bind the successors, assigns, purchasers, lessees, or transferees and to correct the ineffectual language in the previous agreement. Article I permits the successor or assignee to resist an assumption of the Agreement and provides that the UMWA will look to the successor or assignee for compliance with the terms of the Agreement. The contract of the selling defendants with Virginia City gives Virginia City the right to raise the question of whether they are successors, whereas they already retain this right under the BCOA Agreement. The selling defendants have not complied with their part of the Agreement in that they have not secured the agreement of the successor to assume their obligations. Therefore, the selling defendants have violated Article I of the BCOA Agreement.

## COURT DECISIONS SINCE THE 1974 WAGE AGREEMENT

There is very little case law interpreting the separate successorship clause contained in Article I of the 1974 agreement. In *District 17, District 29, Local Union 7113 and Local Union 6023, United Mine Workers of America, et al v. Allied Corp. and Armco, Inc., Shannon Pocahontas Coal Co., et al*, 735 F.2d 121 (4th Cir.1984), the court found that Allied, a selling company, did not violate its obligations under the UMWA contract where it continued to pay health benefits throughout the term of the 1978 UMWA contract and Armco, Inc. and Shannon Pocahontas Coal Co., Inc., the transferee companies, did not qualify as "successors" since they did not assume the employer's obligations to employer's pensioners.[1] In this case, "the District Court found that Allied breached Article I of the 1978 Wage Agreement by not 'securing the agreement of its successors to assume Allied's health benefit obligations to its retired employees under the agreement.'" *Id.* at 125. The Fourth Circuit found that even though it may be assumed that "Allied breached the 1978 agreement", nevertheless Allied was not responsible for any damages; "because Article XX and Article I limit any rights and liabilities of the parties to the term of the contract, the parties could have reasonably foreseen that any damages would extend for the term of the contract until March 27, 1981." *Id.* at 127 and 128. Noting that the 1978 Wage Agreement did not extend beyond three years, the court found that Allied was not

1. Since this opinion was written and before entry, there has been an *en banc* decision in this case, reversing the panel decision. *District 17, et al. v. Allied Corporation et al.*, No. 83–1117(L) (4th Cir. Feb. 11, 1985). The reversal enhances this court's opinion. The dissenting opinion in the *en banc* opinion adopts the panel majority opinion. It appears to be the unanimous view of the Court of Appeals for the Fourth Circuit that Allied breached Article I of its agreement with UMWA, as found by the district court.

In the majority *en banc* opinion, *Id.*, slip op. at p. 11, it is stated:

The agreement, however, also anticipated that operators might withdraw from the coal business and, by Article I, obligated the seller of a coal mine to require the purchaser to assume the seller's obligations under the agreement ... It is clear that Allied breached Article I of the agreement when it agreed with Armco

and Shannon-Pocahontas that the latter, as successors, would not assume Allied's obligations under the 1978 agreement.

In the above paragraph the Circuit Court uses the words "purchaser" and "successor" interchangeably.

Citing *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the court said, "The Supreme Court long ago recognized that collective bargaining agreements were not to be interpreted under traditional rules of contract but under a federal common law of collective bargaining." *Id.*, slip op. at 13. The *Allied en banc* decision further states, "*Allied's* breach occurred in 1980 when it transferred the mine to Armco and Shannon-Pocahontas without passing on all of its obligations as required by Article I of the 1978 collective bargaining agreement." *Id.*, slip op. at 19.

liable beyond the terms of the contract it signed and that since it did not pass any obligations under the 1978 Wage Agreement to Armco and to Shannon Pocahontas, these two companies were not liable even though they later signed the collective bargaining agreement. The court went on to state as follows:

> The District Court found Armco and Shannon-Pocahontas had breached Article I of the 1978 Wage Agreement by purchasing mines from Allied and not assuming Allied's obligations to the plaintiffs. The language of Article I is not susceptible to such construction. The clear language applies only to employers who sell, convey and transfer mines covered by the agreement. Buyers or purchasers of the mines are nowhere mentioned. At the time of the transfer, neither Shannon-Pocahontas nor its predecessor in name were signatory to the 1978 agreement. After acquiring the mines, Shannon-Pocahontas did execute the agreement.

> Armco was a signatory at the time of the transfer of the Allied mine, but it does not follow that Armco is prevented from buying from Allied if it suspected Allied might be in violation of Article I which such violation caused no loss or damage to anyone.

*Id.* at 130.

The Fourth Circuit went on to point out that Armco and Shannon-Pocahontas could not be successors under the authority of *Howard Johnson* because in that case, the Supreme Court held that "the mere existence of a successor clause in a bargaining agreement did not bind Howard Johnson when it was perfectly clear that Howard Johnson refused to assume any obligations under the agreement." *Id.* at 134.

It is significant that in *Allied*, the district court had determined "in its conclusion of law number 4, the court found that 'Article I of the 1978 wage agreement prohibits a signatory employer from transferring a signatory coal operation to a successor or assign without the agreement of the successor or assign to assume the employer's obligation under the wage agreement and any subsequent renewals of said wage agreement.'" *Id.* at 124, fn. 5. It is significant also that in *Allied*, the facts disclose that there was a sale of assets rather than a sale of stock. Furthermore, the transfer to the Shannon mine occurred in the following fashion: this mine was "transferred from Allied to Vera Mining Company, a wholly owned subsidiary of Allied Corporation. Through a merger, Vera became a wholly owned subsidiary of Royal Smokeless Coal Company, which is a subsidiary of A.T. Massey Coal Company. Vera subsequently changed its name to Shannon-Pocahontas." *Id.* at 123, fn. 1. Thus, to summarize the *Allied* opinion as it relates to the instant case, the court did not disturb the finding that Allied had breached its agreement by failing to pass on its signatory coal operation to a successor or assign without securing the agreement of the successor or assign. The court simply held that Allied was not liable under any subsequent renewals of the same wage agreement and for this reason, reversed the district court. The majority opinion notes that Article I is not aimed at buyers or purchasers where there has been nothing passed on to them; it points out that only Allied could have breached the contract.

The dissenting opinion of Judge Sprouse serves to highlight the significance of the majority opinion in the case. Judge Sprouse puts the opinion in perspective as follows:

> In Article I of the 1974 Wage Agreement, Allied agreed that its coal mining operations '... [would] not be sold, conveyed, or otherwise transferred ... to any successor without first securing the agreement of the successor to assume [Allied's] obligations under this contract.' It breached this agreement by selling its Harewood and McDowell County coal operations without passing along its pensioner obligations to the successors. The majority is not disturbed by this breach because Allied provided a form of alternative performance that guaranteed the

pensioners' benefits for the life of the 1978 contract. Article I of the 1978 Wage Agreement, however, guaranteed pensioners more than the rights of benefits for the life of the contract; ... Allied abided by the terms of Article I Armco and Shannon would have entered the 1981 negotiations as the last responsible employers of the retirees. As such, they would have been obligated to negotiate with the Union concerning the continual funding of the 1974 Benefit Fund. The companies may have succeeded in bargaining away these obligations or modifying the benefit arrangements but the pensioners' rights would have been finally decided by the same process that created them, collective bargaining.

This court is of the opinion that, having the full thrust of Judge Sprouse's thinking before them, the majority opinion in this case does not dispute the fact that Allied breached the contract when it failed to pass on the bargaining agreement to Armco and Shannon. In the contract now before this court, the selling defendants have done the same thing that Allied did; they have breached their contract because they failed to pass along the signatory agreement to the successor and assignee.

The case of *Amax Coal Co. v. NLRB,* 614 F.2d 872 (3rd Cir.1980), also supports the position heretofore outlined. In *Amax,* the court, among other decisions, determined that the successorship clause of Article I was not a violation of Section 8(e) of the National Labor Relations Act. In this regard, the court upheld the decision of NLRB. The court specifically held that the successorship clause of Article I of the BCOA Agreement was "lawful because its effect is primary." The court goes on to give the purpose and understanding which the Third Circuit places on the successorship clause and states as follows:

The clause was clearly designed to assure that Amax' own employees would retain their current contractual benefits in the event that their place of employment is sold to a new employer. The only obligation which the clause would place on Amax is to secure the purchaser's agreement to adopt the contract before Amax sells the mining operations to the purchaser—that is, while the employees are still Amax' employees. Once the mining operation is actually transferred, the clause would permit the Union to seek compliance only from the new employer who would have stepped into Amax' shoes and thus become the primary employer of Amax' former employees covered by the contract.

*Id.* at 886, 887.

It is to be noted that the Third Circuit in giving its interpretation of the successorship clause does not deem that the word "successor" has any peculiar meaning but simply refers to the fact that it would require the *purchasers'* agreement to adopt the contract from the person selling the operation. Thus, the Third Circuit interprets the words "successor" and "assign" to mean the same as "purchaser."

The Fourth Circuit in *Allied* and the Third Circuit in *Amax* have deemed the words "successor" and "assign" to be equivalent to the word "purchaser." Under the case law which has developed since 1974 in interpreting this clause, the selling defendants have clearly breached their contract. The court therefore grants partial summary judgment for the plaintiff against Eastover Mining Company, Eastern Land Company and Duke Power Company.

Count Three of the plaintiff's complaint asserts an action against the buying defendant, Virginia City, for interference with contractual relations and for inducing the breach by Eastover of the 1981 BCOA Agreement. The complaint essentially alleges that Virginia City had knowledge of Eastover's obligation under the Agreement to bind its successors, yet induced Eastover's breach by insisting on language which would violate the Agreement. As a result of Virginia City's action, UMWA claims that its property rights were damaged. Virginia City has filed a motion to dismiss. The motion to dismiss is denied. However, summary judgment is not granted against Virginia City at this time.

The Clerk of this court is directed to send certified copies of this Memorandum Opinion and Order to all counsel of record.