**INTERNATIONAL UNION, UMWA, Plaintiff,**

v.

**EASTOVER MINING CO., Eastover Land Co., Duke Power Co. and Virginia City Coal Co., Defendants.**

**Civ. A. No. 83–0209–B.**

United States District Court, W.D. Virginia, Big Stone Gap Division.

Dec. 13, 1985.

Willard Owens, A. Randall Vehar, Washington, D.C., Stuart B. Campbell, Wytheville, Va., John B. Raycen and E.H. Raycen, Knoxville, Tenn., for plaintiff.

David D. Johnson, Charles Q. Gage, Charleston, W.Va., James P. Jones, Bristol, Va., and David J. Boyd, Chicago, Ill., for Va. City.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

International Union, United Mine Workers of America (UMWA) instituted this action pursuant to § 301 of the National Labor Relations Act, 29 U.S.C. § 185(a), against Eastover Mining Company, East- over Land Company, Duke Power Company (selling defendants) and Virginia City Coal Company (purchasing defendant). The action arose over Virginia City's purchase of the selling defendants' Jawbone Mine, located in Wise County, Virginia and operated under a contract with UMWA. UMWA has based its claim against the selling defendants on the contention that they breached Article I of the 1981 Bituminous Coal Operators Association (BCOA) Agreement when they sold the Jawbone operation to Virginia City without requiring Virginia City to assume their obligations under the Agreement. UMWA's claim against Virginia City is based on the allegation that Virginia City tortiously induced the selling defendants to breach the Agreement.

In *International Union, UMWA v. Eastover Mining Co.*, 603 F.Supp. 1038 (W.D.Va.1985), this court entered partial summary judgment for UMWA against the selling defendants on the issue of liability, holding that the selling defendants did not comply with their part of the BCOA Agreement in that they had not secured the agreement of the successor to the mine, Virginia City, to assume their obligations. The court reserved decision as to Virginia City, however, until the issues regarding Virginia City's alleged liability could be more fully briefed. Now that the issues have been so briefed, and that UMWA and Virginia City's cross-motions for summary judgment have been renewed, the court is prepared to rule on the following: (1) whether the action as against Virginia City arises under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a) and (2) if so, whether Virginia City is liable for tortious interference with a contractual relation.

### I.

A summary of the facts established in the court's previous opinion in this action is as follows. In 1982, Duke Power Company, the parent corporation of Eastover Mining Company and Eastover Land Company, decided to sell all of its Eastover mines

because of a ruling of the North Carolina Utilities Commission concerning the passing on of costs to consumers. By January 1983 ANR Coal Company, the parent corporation of Virginia City, decided to attempt to purchase Eastover's Jawbone Mine. At that time, the 1981 BCOA Agreement to which Eastover was a signatory was in force and provided in part in Article I that

This agreement shall be binding upon all signatories hereto ... and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under the Agreement.

Negotiations between Eastover and ANR followed, and agreement was reached on the basic terms of the purchase. Eastover, possessing the intention to comply with Article I of the BCOA Agreement, prepared a first draft of the purchase agreement to be presented to Virginia City that included the following paragraph, Section 1.6(a):

Covenants and agreements of *buyer.* Buyer covenants and agrees: (a) to recognize the United Mine Workers of America as the collective bargaining representative of the bargaining unit employees of the Virginia City mine located at Virginia City, Virginia and to assume EMC's obligations to those employees under the National Bituminous Coal Wage Agreement of 1981.

Virginia City informed the selling defendants, however, that it would not accept the agreement with the foregoing language and further stated that it would not assume the UMWA contract.

Subsequent drafts of the purchase agreement were then exchanged, resulting in the final contract between the selling defendants and Virginia City Coal Company with

the following language, designed as Section 1.7(a):

If buyer is a successor to EMC within the terms of the National Bituminous Coal Wage Agreement of 1981 (the 'Wage Agreement'), to recognize the United Mine Workers of America as the collective bargaining representative of the bargaining unit employees of Virginia City Mine located in Virginia City, Virginia, and to assume EMC's obligations to those employees under the Wage Agreement; provided, however, that Buyer reserves the right to contest the question of whether or not it is a successor within the terms of the said Wage Agreement.

In addition, Section 2.1(c) of the purchase agreement was amended so that the final draft, instead of stating that there was a transfer of all "leases, contracts," provided that there was a transfer of "all leases, contracts (other than the Wage Agreement)." And it was this failure on the part of the selling defendants to secure the obligation of Virginia City to the BCOA Agreement as required by Article I that lead to this court's conclusion that the selling defendants breached the Agreement following a finding that Virginia City was, in fact, a successor to Eastover's Jawbone operation. Moreover, it is Virginia City's alleged role in procuring the inclusion of Section 2.1(c), as well as Section 1.7(a), of the final purchase agreement that gives rise to the claim against Virginia City now before the court.

## II.

■ With the facts above thus established, the court will now address the issue of jurisdiction. As previously stated, UMWA instituted this action against both the selling defendants and Virginia City, the purchasing defendant, pursuant to § 301 of the Labor Management Relations Act.[1] There was no question in the previ-

---

1. Section 301 of the LMRA states:
   Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... may be brought in any district court of the United States having jurisdiction

ous decision that the jurisdictional requirements of § 301 were met as to the selling defendants since UMWA's claim against Eastover was based on an alleged breach of the BCOA Agreement and Eastover was a signatory to the Agreement. Virginia City argues, however, that as a non-signatory to the collective bargaining agreement it is not subject to this court's jurisdiction under § 301 where the claim against it is for tortious interference with contractual relations.

The issue raised by Virginia City as to whether a party to a labor contract may sue a non-signatory under § 301 has been addressed by a number of courts, resulting in a split of authority. The Third and Eleventh Circuits, addressing the issue in the context here presented, that is, on a claim of tortious interference with contractual relations, have held that such a suit falls within the purview of § 301. *Wilkes-Barre Publishing Co. v. Newspaper Guild of Wilkes-Barre, Local 120*, 647 F.2d 372 (3rd Cir.1981); *Local 472, United Association v. Georgia Power Co.*, 684 F.2d 721 (11th Cir.1982). The Ninth Circuit also reached the same conclusion in *Painting and Decorating Contractors Assoc. v. Painters and Decorators Joint Committee*, 707 F.2d 1067 (9th Cir.1983), where the non-signatory defendant's liability for an alleged breach of contract turned on the court's interpretation of the labor contract. Other courts, however, applying a narrow interpretation of the scope of § 301 jurisdiction, have held that a § 301 suit may be brought for violation of a labor contract

only against those who are parties to the contract or who have rights or duties stated in the terms and conditions of the contract.[2] *See, e.g., Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489 (5th Cir.1982); *Service Hospital, Local No. 47 v. Commercial Property Services*, 755 F.2d 499 (6th Cir.1985).

After reviewing the policy considerations underlying the pre-emptive effect of § 301, as most recently expressed by the Supreme Court in *Allis-Chalmers Corp. v. Lueck*, — U.S. ——, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985), this court concludes that the better reasoned decisions are those that have held that § 301 confers jurisdiction on the federal courts in actions such as the one at bar.[3] In the present case, UMWA's claim against Virginia City is founded on a violation of a collective bargaining agreement, despite the fact that Virginia City was not a signatory to that agreement. Virginia City's alleged liability, at least at a threshold level, has hinged on a judicial interpretation of that agreement; only after a holding that the selling defendants breached the BCOA Agreement could UMWA attempt to proceed against Virginia City on its allegation that Virginia City was tortiously involved in bringing about that breach of contract. Consequently, to hold that UMWA must try its case against Virginia City in state court would create the "possibility of conflicting substantive interpretation [of the labor agreement] under competing legal systems," which is what led the Supreme Court to conclude in *Teamsters Local v. Lucas Flour Co.*, 369

---

of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

**2.** It should here be pointed out that *Fox v. Mitchell Transport Inc.*, 506 F.Supp. 1346 (D.Md. 1981) *aff'd mem.* 671 F.2d 498 (4th Cir.1981), is sometimes cited as holding that an action against a non-signatory may not be maintained under § 301. However, the district court's decision that it lacked jurisdiction over the non-signatory defendant in that case was based on the alternative ground that when a claim is for breach of the duty of fair representation under the collective-bargaining agreement, only the employee's collective-bargaining agent can be liable under § 301, and the non-signatory de-

fendant was not such an agent. Thus, as UMWA argues, since the Fourth Circuit's decision consisted of but one word, "affirmed," it can hardly be said that the Fourth Circuit has spoken to the issue now before this court.

**3.** For a related case involving § 301 jurisdiction in a breach of contract action, see this court's recent published opinion, *Mallory v. Ingersoll-Rand*, 621 F.Supp. 1040 (W.D.Va.1985), where the court, relying on *Allis-Chalmers*, held that the action was pre-empted by federal law under § 301. There, however, the defendant was a signatory to the subject collective-bargaining agreement.

U.S. 95, 104, 82 S.Ct. 571, 577, 7 L.Ed.2d 593 (1964), that by "enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." Faced with similar circumstances, the court in *Wilkes-Barre* took the position that "so long as the obligation sought to be enforced has its source in the provisions of a collective bargaining agreement, remedies for its enforcement may be available under section 301(a) in suits other than on the contract itself." 646 F.2d at 380. The issue for the court was not the nature of the remedy sought, but rather whether the court from which the remedy was sought would have to interpret the collective bargaining agreement. *Id.* The court thus determined that it had jurisdiction under § 301 over a non-signatory to a collective-bargaining agreement who was alleged to have tortiously interfered with the contractual relations of the parties to that agreement. *Id.* at 381. In making that determination, the court reasoned that

> The label attached to the remedy as tort or contract is not dispositive of the scope of federal common law which under section 301(a) it is our responsibility to create. A holding that tortious interference with a collective bargaining agreement is not a matter governed by federal law would leave open the possibility of lack of uniformity in scope of obligation which the Court in *Lucas Flour* sought to prevent.... [P]rotection against tortious interference does not involve an area traditionally relegated to the states. Rather it involves protection of a property interest—a labor contract—which has its being in and draws its vitality from the federal common law of labor contracts.

*Id.* (footnote and citations omitted).

Such an analysis of the scope of § 301 jurisdiction can only be viewed as reenforced by *Allis-Chalmers v. Lueck.* Though the case does not involve a claim against a non-signatory to a labor agreement, the Court's reasoning as to the scope of § 301's pre-emptive effect is the same as that in *Wilkes-Barre.* In *Allis-Chalmers,* the respondent/employee had brought an action against his employer over his employer's handling of his disability claim, which was filed under a plan that was part of a collective-bargaining agreement between his employer and his union. The Wisconsin Supreme Court had held that the action was a tort action arising under state law. The *Allis-Chalmers* Court, relying on the policy considerations set out in *Lucas Flour,* reversed the state court and held that the action was governed by federal substantive law under § 301. *Allis-Chalmers,* —— U.S. ——, 105 S.Ct. at 1916. Building upon the *Lucas Flour* decision, which held that a suit for an alleged violation of a labor contract must be brought under § 301 and resolved by reference to federal law, the Court stated:

> If the policies that animate § 301 are to be given their proper range, however, the pre-emptive effect of § 301 must extend beyond suits alleging contract violations.... The interests in interpretive uniformity and predictability that require that labor-contract disputes be resolved by reference to federal law also require that the meaning given a contract phrase or term be subject to uniform federal interpretation. Thus, questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.

*Allis-Chalmers,* —— U.S. at ——, 105 S.Ct. at 1911. The Court then went on to conclude "that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim ... or dismissed as pre-empted by federal labor-contract law." *Id.* at ——, 105 S.Ct. at 1916.

It is thus this court's opinion that UMWA's action against Virginia City for tortious interference with a contractual relation constitutes an action arising under

§ 301, and as such is governed by federal common law.

### III.

■ The court now turns to the merits of UMWA's action against Virginia City. The elements of an action for tortious interference with contractual relations are generally stated to include (1) the existence of a valid contract, (2) the defendant's knowledge of the contract, (3) malicious interference by the defendant, (4) a causal relationship between the defendant's interference and the breach or nonperformance of the contract and (5) resulting damages. *McDonough v. Kellogg*, 295 F.Supp. 594, 598 (W.D.Va.1969); *see generally Anno.*, 26 A.L.R.2d 1227 (1952). Since the validity of the BCOA Agreement, the selling defendants' breach of the Agreement, and Virginia City's knowledge of the Agreement have all previously been established, the only real issue here is whether Virginia City was a moving cause in the breach of the Agreement by way of malicious interference.

The term "malicious interference," as used in this context, is somewhat misleading. The law does not require proof that the defendant acted with ill will or spite, but only that the interference was intentional and unjustified. *McDonough v. Kellogg*, 295 F.Supp. at 598. And as Dean Prosser explains, "when interference with the performance of the contract is intended, the manner of the interference itself is not of great importance." Prosser, *Handbook of the Law of Torts* 926 (4th Ed.1971). He then goes on to explain that where a breach "is intentionally brought about by the defendant's inducement, or is even a foreseeable risk which defendant has created, it seems clear that the result is well within the limits of the 'proximate.'" *Id.* at 928.

As to the manner of interference, it is indicated in the comments to *Restatement (Second) of Torts* § 766 (1979)[4] that "[t]here is no technical requirement as to the kind of conduct that may result in interference with the third party's performance of the contract." *Id.* at 12. It is pointed out, however, that the interference is often by inducement. *Id.* "The word 'inducing,'" it is stated, "refers to the situation in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences." *Id.* at 11. Thus, the inducement may take the following forms: "... it may be a simple request or persuasion exerting only moral pressure.... it may be a statement unaccompanied by any specific request but having the same effect as if the request were specifically made.... [o]r it may be the promise of a benefit to the third person if he will refrain from dealing with the other." *Id.* at 12.

An action for tortious interference with contractual relations being so defined, the court is convinced that UMWA must prevail on its motion for summary judgment against Virginia City on the issue of liability. Based on the record, it appears to the court glaringly clear that Virginia City induced Eastover to breach its contract with UMWA by persuading Eastover to agree to the inclusion of Section 2.1(c) of the final purchase agreement through which Virginia City acquired the Eastover Jawbone Mine without assuming Eastover's obligations under the BCOA Agreement. Had Eastover first approached Virginia City with an offer to sell the mine that included terms falling short of the requirements of Article I of the Agreement regarding successorship, then Virginia City would not fit within the legal standard for tortious interference with contractual relations. But

---

**4.** *Restatement (Second) of Torts* § 766 reads as follows:

§ 766. Intentional Interference with Performance of Contract by third Person

One who intentionally and improperly interferes with the performance of a contract (ex-

cept a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the failure of the third person to perform the contract.

such was not the case. Here, as was previously pointed out, Eastover began its negotiations with Virginia City with the intention of complying with the requirements of Article I. Virginia City, on the other hand, did not intend from the beginning to become involved with UMWA. *International Union, UMWA v. Eastover Mining Co.,* 603 F.Supp. 1038, 1040 (W.D.Va.1985). Thus, while offering Eastover 22.3 million dollars in cash for its Jawbone operation, Virginia City informed Eastover that it would not assume the UMWA contract as provided for in Section 1.6(a) of the first draft of the purchase agreement, which Eastover had prepared. *Id.* at 1041. Subsequently, Eastover agreed to conform the terms of the sale to this condition, which is evidenced by the terms of Section 2.1(c) of the final purchase agreement. As a result of this conformity, Eastover, as the selling defendant, has been held liable for breaching its contract with UMWA. The same conformance is now found to be the product of Virginia City's inducement, which thus establishes Virginia City's liability as the purchaser of Eastover's mine.

Virginia City argues that its conduct with respect to the successorship clause in the BCOA Agreement does not satisfy the intent element necessary in establishing tortious interference with a contractual relationship. The contention is that it was simply wrong in its interpretation of the successorship clause, but that its belief was not unreasonable so as to negate its good faith. Pursuing this line of argument, Virginia City states in its supplemental brief:

> The language of the Purchase Agreement between Eastover and Virginia City itself testifies to Virginia City's good faith. [Section 1.7(a)] declares that if Virginia City is Eastover's successor within the terms of the 1981 agreement, Virginia City will assume all of Eastover's obligations under the agreement. That is, even though Virginia City believed it was not a successor within the meaning of the 1981 agreement, it agreed to assume all the duties of a successor if it was deemed to be such.

But to the contrary, what in fact is established by Section 1.7(a) is at the very least Virginia City's awareness of the foreseeable risk that its agreement with Eastover to avoid any obligations to UMWA would violate the terms of Article I of the BCOA Agreement. Thus, by agreeing to the inclusion of Section 1.7(a), Virginia City was simply attempting to preserve its right to "contest the question of whether or not it is a successor within the terms of the said Wage Agreement," as so stated in Section 1.7(a).

Virginia City's awareness of the risk involved in purchasing the Jawbone Mine under the terms that it demanded is further evidenced by the fact that Virginia City saw fit to consult with a management consulting firm, Southeastern Employee Service Corporation, SESCO, as to how it might be advised on a way to circumvent the terms of the successorship clause in the BCOA Agreement. *See, Eastover Mining Co.,* 603 F.Supp. at 1041 (outlining the three-point plan that Virginia City was advised to use in trying to achieve its purpose, a plan eventually accepted and implemented by Eastover). This fact is made most evident in the following excerpt from the deposition testimony of Raymond F. Parker, the chief negotiator for Virginia City, regarding his communications with SESCO:

Q. I take it you had called or communicated with SESCO in some way and told them that you were thinking about trying to acquire the Jawbone operation?

A. That is correct.

Q. And I assume you told SESCO that you were attempting to acquire Jawbone in such a way as you would not have to assume the UMWA contract?

A. Yes, sir.

Q. Or have to legally recognize or have anything to do with the UMWA?

A. That is correct.

Q. Or the employees working at the Jawbone Mine?

A. That is also true.

Finally, the court rejects Virginia City's argument that it was justified in securing the terms of the final purchase agreement between it and Eastover. Justification is sometimes the final consideration in the analysis of a case involving a claim of tortious interference with a contractual relation. It basically involves a balancing process in which the interests of the plaintiff are weighted against the interests of the defendant. *See generally, Restatement (Second) of Torts*, § 767 (1979). Here, the interests represented by UMWA far outweigh whatever interests Virginia City might have in attempting to acquire the Jawbone Mine free of obligations to UMWA. The interests UMWA seeks to vindicate over Virginia City's role in procuring the breach of Article I of the BCOA Agreement goes to the core of the right to bargain collectively. In gaining that right, the members of UMWA were able to secure through their bargaining agent the successorship clause in Article I. Having secured that provision, those members that worked at the Jawbone operation had an expectation of certainty, as well as a legal right to such certainty, in matters such as wages, health benefits, seniority, and pensions. Virginia City, on the other hand, had no prior interest in the Jawbone operation. Thus, as a matter of policy, Virginia City's interest, for example, in negotiating freely as a prospective purchaser wanes when compared to the interests represented by UMWA.

### IV.

In summary, it is the opinion of the court that UMWA's action against Virginia City arises under § 301 of the National Labor Relations Act, 29 U.S.C. § 185(a), giving the court jurisdiction over Virginia City. It is also the court's opinion that Virginia City tortiously interfered with the contractual relations between UMWA and Eastover by persuading Eastover to breach the 1981 BCOA Agreement. Therefore, Virginia City's motion for summary judgment is hereby denied while UMWA's motion for summary judgment on the issue of liability is hereby granted. An appropriate order will be entered granting summary judgment to the plaintiff in this cause.

The Clerk is directed to send certified copies of this Memorandum Opinion to counsel of record.